**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOSUE OSMARO GARCIA-OCHOA,
a/k/a Josue O Garcia,

*Defendant-Appellant.*

No. 09-4620

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOSUE OSMARO GARCIA-OCHOA,
a/k/a Josue O Garcia,

*Defendant-Appellant.*

No. 09-4621

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Robert G. Doumar, Senior District Judge.
(2:08-cr-00104-RGD-JEB-1; 2:08-cr-00153-RGD-JEB-1)

Argued: May 12, 2010

Decided: June 11, 2010

Before WILKINSON and KING, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED**: John Christian Gardner, GARDNER & MEN-DOZA, PC, Virginia Beach, Virginia, for Appellant. James Ashford Metcalfe, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellee.

## OPINION

WILKINSON, Circuit Judge:

Following a bench trial, Josue Osmaro Garcia-Ochoa was found guilty under 18 U.S.C. §§ 1001 and 1546(a) for falsely declaring, on several occasions, that he was a "citizen or national of the United States" or a "lawful permanent resident" on I-9 Employment Eligibility Verification Forms. Although the defendant admits to misrepresenting his immigration status in seeking employment, he challenges the sufficiency of the evidence to sustain his convictions, arguing that his misrepresentations were not material because he was nonetheless authorized to work in the United States.

The district court rejected the defendant's claim and concluded that the government had proven materiality beyond a reasonable doubt. Specifically, the court found that the defendant's misstatements were material because they were capable of influencing agency action—affecting, for example, the Immigration and Custom Enforcement's enforcement of immigration laws. On appeal, we likewise reject the defen-

dant's claim. We decline to render the I-9 Form a meaningless exercise that allows applicants to check any immigration-status box they wish.

I.

A.

The following facts are those presented at trial and are not in dispute. The defendant, Josue Osmaro Garcia-Ochoa, was born in San Salvador, El Salvador in 1975. He entered the United States in 1998 and subsequently obtained Temporary Protected Status ("TPS") with authorization to work in the United States. TPS is an immigration benefit granted by the Secretary of Homeland Security to citizens of designated countries suffering specified hardships, such as El Salvador after its 2001 earthquake. TPS is a temporary status, subject to expiration or termination; TPS beneficiaries may lose their status, along with their work authorization, either if they fail to renew it periodically (approximately every six to eighteen months) or if the Secretary of Homeland Security revokes their country's designation.

As a TPS beneficiary, the defendant was considered an alien with temporary work authorization. He was neither a U.S. citizen nor a lawful permanent resident. Since the appeal of this case, the defendant has lost his status as a TPS alien, and a deportation proceeding is currently pending in the Executive Office of Immigration Review. It is uncontested, however, that when the defendant was applying for jobs, he was a TPS alien in the United States legally and with authorization to work.

On three separate occasions in applying for employment, the defendant made false statements regarding his immigration status on I-9 Employment Eligibility Verification Forms. These forms are prepared by the Department of Homeland Security to satisfy federal statutory requirements and must be

completed by all applicants for employment in the United States. *See* 8 U.S.C. § 1324a(b). The I-9 Form requires applicants to check one of three boxes, attesting under penalty of perjury that they are either a "citizen or national of the United States," or a "lawful permanent resident" (and if so, supplying their alien identification number), or an "alien authorized to work until _____" (and if so, providing the expiration date of their work authorization). The I-9 Form further warns applicants, in bold lettering, that "federal law provides for imprisonment and/or fines for false statements . . . in connection with the completion of this form."

In January 2006, the defendant applied for a job with Century Concrete in Virginia Beach, Virginia. In doing so, he filled out the requisite I-9 Form, checking the box to assert that he was a "citizen or national of the United States." On Century Concrete's separate application form, the defendant incorrectly listed his birthplace as Houston, Texas. Century Concrete hired the defendant but terminated him after a few months due to bad performance.

In June 2006, the defendant applied for a job with S.B. Ballard Construction Company, also in Virginia Beach, Virginia. On his I-9 Form for S.B. Ballard, the defendant falsely claimed that he was a "lawful permanent resident" and provided his alien number. In a separate job application form, he properly informed S.B. Ballard that he was born in El Salvador. S.B. Ballard hired the defendant but removed him from the employment roster a few months later when he failed to show for work.

In August 2006, the defendant applied for employment with Heard Concrete Construction in Chesapeake, Virginia. Again, he completed an I-9 Form, in which he falsely declared that he was a "citizen or national of the United States." He also filled out a separate "special jobs questionnaire," in which he falsely stated he was born in Houston, Texas. Heard Concrete hired the defendant.

Not long thereafter, Heard received a contract to perform concrete construction work at the Norfolk Naval Base. This type of work was not out of the ordinary for Heard, which often works on military bases and other government facilities where access depends, in part, on an employee's immigration status. Federal agents testified that some portions of naval bases, for example, are "highly sensitive" and contain "critical infrastructure," such that non-citizens, regardless of work authorization status, are denied access. Because of these rules, Heard Concrete's employees must be screened to ensure that no unauthorized persons are performing work on off-limits areas of government property. Based on the defendant's mis-statements, however, Heard mistakenly believed the defen-dant was a U.S. citizen born in the United States. Heard passed along that information to the Navy, which relied on it to grant the defendant complete access to its naval bases throughout the mid-Atlantic region. The defendant was issued an access badge that was colored green to indicate broad access. The badge further noted his permission to enter "All Region Bases" and did not contain the normal notation for foreign-born persons next to "Naturalization/Visa."

B.

Gradually, the defendant's misrepresentations began to unravel and an investigation by special agents within the Department of State, Immigration and Customs Enforcement, and the Naval Criminal Investigation Services revealed that the defendant was, contrary to what he told employers, a TPS alien born abroad. Consequently, in 2008, the United States brought criminal charges in two separate cases that have since been consolidated. Among the charges are those relevant to this appeal: making false statements to the executive branch of the federal government in violation of 18 U.S.C. § 1001 and making false statements in immigration documents in vio-lation of 18 U.S.C. § 1546(a).

After the defendant waived his right to a jury trial, the con-solidated cases proceeded to a bench trial in the Eastern Dis-

trict of Virginia. At the close of the government's case, the defendant moved for judgment of acquittal on the basis of insufficient evidence, arguing that his misstatements were not material. In the defendant's view, the sole purpose of the I-9 Form is to verify that an applicant is authorized to work in the United States, and misstatements of immigration status are therefore material only when they disguise an applicant's lack of work authorization. Because the defendant was work eligible, and further because employers are legally prohibited from discriminating against work-eligible applicants on the basis of their immigration status, the defendant argued that the precise details of his immigration status were irrelevant and hence immaterial.

The district court squarely rejected this claim, finding that the government had proven beyond a reasonable doubt each element of the crimes, including that of materiality. *United States v. Garcia-Ochoa*, 2009 WL 331282, at *6, 11 (E.D. Va. Feb. 9, 2009). While the court acknowledged that employers could not deny the defendant employment simply because he was a TPS alien, it nonetheless found that his misstatements satisfied the test for materiality, because "the I-9 Form provides information capable of influencing governmental and executive agency action." *Id.* at 5-6.

In so finding, the court noted that employers are required to retain I-9 Forms for several years after hiring an individual, and that during this time, the I-9 Forms are readily available for review by government officials from several federal agencies. *Id.* at *6; *see* 8 U.S.C. § 1324a(b)(3). The court found that federal agencies rely on the information contained in the I-9 Forms in policing both employers and employees and therefore need that information to be thorough and accurate. *Id.* at *6, 11. In this regard, the court cited the testimony of a Special Agent for Immigration and Customs Enforcement ("ICE"), who reported that "the I-9 Form is frequently used for investigative purposes in pursuing illegal aliens in this country." *Id.* at *6. Accordingly, lest "law enforcement and

other governmental agencies be deprived of an important investigatory tool," the court refused to deem the I-9 Form's question about immigration status "inconsequential" and "unnecessary." *Id.* at *6, 11. Ultimately, the district court convicted the defendant of three counts under 18 U.S.C. § 1001 and two counts under 18 U.S.C. § 1546(a). *Id.* The court sentenced him to six months' imprisonment on each count to run concurrently, three years' supervised release, and a $100 special assessment on each count. The defendant now timely appeals.

## II.

On appeal, Garcia-Ochoa renews his argument that his misstatements were not material. Materiality is an essential element of the offenses under both 18 U.S.C. § 1001 and 18 U.S.C. § 1546(a). *See United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998). "The test of materiality is whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action." *United States v. Norris*, 749 F.2d 1116, 1122 (4th Cir. 1984); *see Kungys v. United States*, 485 U.S. 759, 770 (1988). This test applies in numerous contexts, including both §§ 1001 and 1546(a), to assess materiality whenever it is an element of a statutory offense. *See, e.g.*, *United States ex rel. Berge v. Bd. of Trs. of Univ. of Ala.*, 104 F.3d 1453, 1460 (4th Cir. 1997).

Our review of the district court's finding of materiality is necessarily limited. Materiality, as an element of a criminal offense, is a question of fact (or at the very least, a mixed question of law and fact) to be resolved by the fact finder, which in the case of a bench trial is the federal district judge. *United States v. Gaudin*, 515 U.S. 506, 511-12, 522 (1995); *United States v. David*, 83 F.3d 638, 641 (4th Cir. 1996). Following a bench trial, we review the court's factual findings for clear error. Further, in assessing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the government in order to decide whether "*any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States v. Jeffers*, 570 F.3d 557, 565 (4th Cir. 2009). Thus, the question before us on appeal is a narrow one: whether the district court clearly erred in finding that the defendant's admitted misrepresentations of his immigration status on I-9 Forms were capable of influencing agency action.

In this case, the district court did not err in finding materiality. The defendant's misstatements were capable of influencing agency action in a number of ways, and by a number of agencies. We highlight two such examples.

A.

To begin, the defendant's statements on his I-9 Forms were capable of affecting the United States Immigration and Customs Enforcement insofar as ICE relies on I-9 Forms to monitor employers and employees for ongoing compliance with immigration laws. ICE is an investigative agency within the executive branch and under the supervision of the Department of Homeland Security that is responsible for enforcing the nation's immigration laws. *See United States v. Wu*, 419 F.3d 142, 146 n.3 (2d Cir. 2005). As such, ICE's role encompasses enforcing the comprehensive statutory scheme, codified in 8 U.S.C. § 1324a and central to federal immigration policy, which prohibits the employment of unauthorized aliens in the United States. *See Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002).

ICE's principal tool in ensuring compliance with this statutory regime is the employment verification system, of which the I-9 Form is the backbone. *See* 8 U.S.C. § 1324a(b); *see also* ICE Website, *http://www.ice.gov/pi/worksite/index.htm*. Under the employment verification system, applicants for employment in the United States must complete an I-9 Form,

in which they provide basic identifying information and assert their immigration status, and must supplement the form with documentation evidencing their claimed identity and immigration status. While ICE relies heavily on employers to verify applicants' employment eligibility, employers in turn depend on applicants to furnish them with true and complete information on I-9 Forms.

In this sense, the smooth functioning of the entire employment verification system hinges crucially on the honesty of employment applicants; by falsifying I-9 Forms, applicants compromise ICE's ability to effectively enforce the statutory prohibition on employing unauthorized aliens. As the First Circuit noted, the prohibition on false statements in 18 U.S.C. § 1001 is "intended to promote the smooth functioning of government agencies and the expeditious processing of the government's business by ensuring that those who deal with the government furnish information on which the government confidently may rely." *United States v. Arcadipane*, 41 F.3d 1, 4 (1st Cir. 1994); *accord United States v. Tobon-Builes*, 706 F.2d 1092, 1096 (11th Cir. 1983); *Ogden v. United States*, 303 F.2d 724, 742 (9th Cir. 1962).

The defendant suggests, however, that the I-9 Form is incapable of influencing *government* action because it is submitted in the first instance to *private* employers. This view is mistaken. The cooperative public-private nature of the employment verification program does not somehow remove it from the purview of 18 U.S.C. §§ 1001 or 1546(a). To the contrary, where Congress has specifically provided for agency access to I-9 Forms, *see* 8 U.S.C. § 1324a(b)(3), the fact that an agency may not avail itself of the opportunity to review each and every I-9 Form in no way lessens the form's significance. Agencies do not forfeit their power to act merely because they entrust private entities to assist their enforcement efforts in the first instance.

The defendant is also wrong to contend that his repeated misrepresentations were incapable of undermining agency

action here simply because he was work eligible. Contrary to defendant's view, his precise immigration status was relevant to ICE even though he happened to be, at the time he filled out the I-9 Forms, authorized to work in the United States. This is because federal law, under 8 U.S.C. § 1324a(a)(1) & (2), explicitly makes it illegal not merely to *hire* unauthorized aliens but, more broadly, to *employ* them. As the Supreme Court has emphasized, "if an employer unknowingly hires an unauthorized alien, or if the alien becomes unauthorized while employed, the employer is compelled to discharge the worker upon discovery of the worker's undocumented status." *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 148 (2002) (citing 8 U.S.C. § 1324a(a)(2)).

Accordingly, the exact nature of the defendant's immigration status as a TPS alien was material because it signaled that his work authorization was inherently temporary—in need of periodic renewal and subject to termination. If and when the defendant's status as a TPS alien expired or was revoked, he would cease to be eligible for employment. And at that point, ICE would indisputably be capable of acting to prevent his continued employment in the United States—for example by bringing charges against his employer if it did not terminate him. *See* 8 U.S.C. § 1324a(a)(6)(C), (e), & (f). It is undisputed that ICE has statutory authority to access the I-9 Form. *See* 8 U.S.C. § 1324a(b)(3). By concealing his true immigration status, the defendant inhibited ICE in its task of ensuring that all employees in the United States are authorized to work, not only at the moment they are hired but at all times thereafter.

The very format of the I-9 Form itself confirms this view. After all, the form does not simply ask: "Do you have work authorization right now?" Instead, it asks a more nuanced question that recognizes the importance of the exact immigration status that allows an applicant to work in the United States. Specifically, the I-9 Form distinguishes between three types of applicants, all of whom are employment eligible: U.S. citizens or nationals; lawful permanent residents; and

aliens with temporary authorization. If an applicant selects the third option, the form further prompts him to disclose the expiration date of his temporary work authorization.

In this instance, the inclusion of the question is evidence that its answer is material. Since Congress specifically required job applicants to disclose their immigration statuses, and the I-9 Form provided by DHS requires them to specifically reveal if they are an "alien authorized to work [for a limited amount of time]," it follows that a false reporting of information deemed important by the legislature and executive cannot lightly be deemed unimportant by the courts. Indeed, the I-9 Form's question about immigration status constitutes the bulk of the form's substance, with the remaining portions requesting the applicant's name, address, date of birth, and social security number. The fact that the form requires applicants to respond under penalty of perjury and under the threat of criminal liability is further evidence that the inquiries therein are neither inconsequential nor superfluous.

We must decline therefore the defendant's invitation to eviscerate the importance of the I-9 Form's main inquiry by overturning the district court's finding of materiality. As the district court summarized:

> In essence, the Defendant argues this: a false statement on the I-9 Form cannot be material if the applicant is authorized to work in the United States. And the logical conclusion of this argument requires this Court to believe that the I-9 Form, issued by the Department of Homeland Security, is of no legal consequence. If we were to accept the Defendant's argument as true, then it would make the Defendant's oath on the I-9 Form completely unnecessary.

> This cannot be. The I-9 Form is not a useless piece of paper with a useless statement on it.

*United States v. Garcia-Ochoa*, 2009 WL 331282, at *6 (E.D. Va. Feb. 9, 2009).

B.

Garcia-Ochoa's misrepresentation on his I-9 Form to Heard Concrete is material for an additional reason: it actually affected the Navy's action, causing it to issue him an access badge that it would not have issued him had it known the truth about his immigration and work authorization status. While the test for materiality demands only that a misstatement be *capable* of influencing agency action, *see Kungys v. United States*, 485 U.S. 759, 770-71 (1988); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1095 (4th Cir. 1993), that test is unquestionably satisfied when, as here, the defendant's falsehoods *did in fact* influence agency action. Actually influencing an agency to act is proof positive that a statement is capable of influencing an agency to act.

As the district court noted, several witnesses testified at trial that "certain portions of Naval bases are highly sensitive" areas that prohibit unauthorized persons from gaining access — "regardless of their legal status within this country." *United States v. Garcia-Ochoa*, 2009 WL 331282, at *3 (E.D. Va. Feb. 9, 2009). The Deputy Director for Regional Security of the U.S. Navy testified, for example, that "there are restrictions as to where a non-U.S. citizen can work," such as "[o]n the ships, the combat information centers, any of the ships that have nuclear reactors, those areas, the munitions area, the munitions command—they're not allowed to work in any of those areas."

Because these off-limits locales are, according to testimony, "highly sensitive" and contain "critical infrastructure," the Navy considers access by unauthorized individuals a potential security threat. As ICE explains, "[u]nauthorized workers employed at sensitive sites and critical infrastructure facilities—such as airports, seaports, nuclear plants, chemical

plants and defense facilities—pose serious homeland security threats." Workforce Enforcement Advisory, *http:// www.ice.gov/pi/worksite/index.htm*. In order to protect these vulnerable portions of naval bases, the Department of the Navy screens all persons prior to granting them clearance.

Here, however, the defendant thwarted the Navy's screening process by misrepresenting his immigration status on his Form I-9. By checking the box on the I-9 Form marking himself as a "U.S. citizen or national," especially in combination with his statement on the "special jobs questionnaire" that he was born in Texas, the defendant thoroughly confounded Heard Concrete, leading it to believe that he was a native-born U.S. citizen. In turn, Heard Concrete conveyed the defendant's falsehoods to the Navy for purposes of determining the defendant's access to its military installations. As the superintendent for Heard Concrete testified, "if [I] knew that [the defendant] was lying about his status . . . I certainly wouldn't send him to the U.S. Government for an ID card."

It is uncontested that the Navy relied on the defendant's misstatements, as conveyed to it by Heard Concrete, in issuing him an access badge allowing him unrestricted access to all naval bases throughout the mid-Atlantic region. It is also undisputed that if the Navy had known that the defendant was a TPS alien, his badge would have noted limitations on his access. Fortunately, the defendant's deceit was discovered before he began working on any naval bases, but a Navy official testified that if he had performed work, he likely would have done so in those areas where access is limited to U.S. citizens, given that the defendant's employer is a concrete company and that a number of the restricted areas contained concrete. When misstatements on a Form I-9 influence the federal government to act in a way that compromises the safety of military personnel, not to mention the general public, those statements are material.

### III.

Appellant asks us to hold that false claims of citizenship in the United States of America make no difference. But they do. The judgment is

*AFFIRMED.*