**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1167

LAKSHMI INJETI,

                    Plaintiff – Appellant,

          v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,

                    Defendant – Appellee.

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.  Roger W. Titus, District Judge.  (8:11-
cv-00584-RWT)

Argued:  September 18, 2013        Decided:  December 11, 2013

Before DAVIS, WYNN, and DIAZ, Circuit Judges.

Affirmed in part and vacated in part by published opinion.
Judge Diaz wrote the opinion, in which Judge Davis and Judge
Wynn joined.

**ARGUED:** Jeffrey Brian O'Toole, O'TOOLE, ROTHWELL, NASSAU &
STEINBACH, Washington, D.C., for Appellant.  Erez Reuveni,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellee.  **ON BRIEF:** Karen Burke, O'TOOLE, ROTHWELL, NASSAU &
STEINBACH, Washington, D.C., for Appellant.  Stuart Delery,
Acting Assistant Attorney General, Civil Division, Samuel P. Go,
Senior Litigation Counsel, Office of Immigration Litigation,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellee.

DIAZ, Circuit Judge:

Lakshmi Injeti, a native and citizen of India, entered the United States on a nonimmigrant visa in 1991. In 2001, she was granted an adjustment of status to lawful permanent resident ("LPR"). Injeti applied for naturalization in 2006, and in the course of reviewing her application, U.S. Citizenship and Immigration Services ("USCIS") discovered that her prior application for LPR status contained a misrepresentation. Although Injeti had in fact been married twice, the application stated that she had no former husbands. USCIS also discovered that, in connection with a separate immigration proceeding, Injeti had submitted a fraudulent death certificate for her first husband. On the basis of this information, it denied her application for naturalization.

Injeti sought review of USCIS's decision in the U.S. District Court for the District of Maryland. Finding that Injeti was ineligible for naturalization because she (1) had not been lawfully admitted for permanent residence, and (2) failed to demonstrate good moral character, the district court granted summary judgment for USCIS. Injeti appeals the district court's order, arguing that she satisfied both conditions. As we explain below, we affirm the district court's judgment in part, and vacate it in part.

I.

A.

Injeti was born in Andhra Pradesh, India in 1960. She married her first husband, Rajurao Injeti ("Mr. Injeti"), sometime between 1974 and 1977. The two lived together in India with Mr. Injeti's parents until 1981, when Injeti moved to Qatar, without her husband, to seek employment. Though living apart, they remained in intermittent contact until 1987. Injeti alleges that, in 1988, she received a letter from Mr. Injeti's parents informing her that he had died. Injeti claims she has neither seen nor heard from Mr. Injeti since.

In June 1991, Injeti married Mohammed Farook Shaikh, an Indian citizen whom she met in 1988 while living in Qatar. According to Injeti, she did not obtain a divorce prior to marrying Shaikh because she believed Mr. Injeti was dead. Shaikh had also been previously married, but Injeti claims Shaikh informed her that he was a widower.

Injeti entered the United States on a nonimmigrant visa in November 1991 to work as an employee of a Qatari diplomat. Sometime thereafter, she began working as a housekeeper for an American couple, Stewart and Sharon Karr. Stewart Karr filed an employment-based visa petition on Injeti's behalf, which was approved in December 1993.

3

On the basis of the approved petition, Injeti filed an application for adjustment to LPR status. Injeti's application indicated that her husband, Shaikh, was applying with her, and also listed the names of three children from her first marriage. However, in response to a question about the identity of "former husbands or wives," Injeti's application incorrectly stated "none." J.A. 117. According to Injeti's then attorney, this inaccuracy arose from his own inadvertent error: although Injeti informed him that she was a widow, he "mistakenly entered 'none' in the box where the name of a former spouse should be entered." J.A. 261. Nevertheless, Injeti signed the application, certifying "under penalty of perjury" that the information it contained was "true and correct." J.A. 137.

Injeti was granted LPR status on January 19, 2001. Shaikh was accorded LPR status as a derivative beneficiary, as were two of Injeti's children. Sometime thereafter, Injeti and Shaikh filed an application for derivative LPR status for Shaikh's son. During the application process, immigration officials discovered that Shaikh, in applying for LPR status, had submitted a fraudulent death certificate for his first wife. In fact, Shaikh's first wife was alive. Based on this information, the government initiated removal proceedings against Shaikh, Injeti, and Injeti's two children in June 2005.

4

Shaikh obtained a divorce from his first wife and remarried Injeti in April 2006. Around the same time, during the course of the removal proceedings, Injeti submitted to immigration officials a document purporting to be a death certificate for her first husband, Mr. Injeti. According to Injeti, she received this document by mail sometime between 1999 and 2001 after requesting it from Mr. Injeti's parents. Although USCIS would later determine that the death certificate for Mr. Injeti was also fraudulent, in the interim, an immigration judge terminated the removal proceedings against Injeti, concluding that Shaikh's misrepresentation regarding his first wife "was only attribut[able] to [his] actions." J.A. 27.

On May 11, 2006, Injeti filed an application for naturalization with USCIS. Like her prior adjustment application, this application omitted her marriage to Mr. Injeti, answering "1" to a question asking "[h]ow many times have you been married?" J.A. 195. According to the attorney who assisted Injeti with completing her application, this error occurred as a direct result of the prior inaccuracy on her adjustment application. Injeti's naturalization application was prepared, in part, by automated computer software, and the software simply "transfer[red]" the inaccurate information from the adjustment application to the naturalization application. J.A. 371. The attorney stated in an affidavit that he did not

5

become aware of either error until after both forms had been submitted.

While Injeti's naturalization application was under review, USCIS received a letter from an individual named "Anton," who claimed to be the boyfriend of Injeti's daughter Suvarna. The letter stated that Injeti and Shaikh had each submitted fraudulent death certificates for their former spouses, and that Mr. Injeti remained alive in India. The letter further stated that Injeti and Shaikh had "threatened" Suvarna "not to tell the truth" to an immigration judge. J.A. 254. Although the letter did not provide Anton's last name, it listed two e-mail addresses and a mailing address in Australia where he could be reached.

USCIS subsequently interviewed Injeti, who stated that she had previously been married to Mr. Injeti. USCIS officials then contacted officials in India, who informed them that Mr. Injeti's purported death certificate, which Injeti had previously submitted, was fraudulent. In fact, the certificate's registration number was associated with a valid death certificate for another individual. USCIS did not immediately take further action.

Injeti filed suit in the U.S. District Court for the District of Maryland seeking adjudication of her naturalization application. In connection with these proceedings, she

submitted an affidavit from her attorney, David Rothwell, explaining the inaccuracies in her application forms. She also submitted her and Shaikh's original marriage certificate, which stated that both were widowed at the time of their marriage.[1] The district court remanded the case to USCIS for adjudication.

USCIS denied Injeti's application for naturalization. USCIS reasoned that, because Injeti had omitted mention of her first husband from her adjustment application and had later submitted a fraudulent death certificate, she failed to meet her burden of establishing eligibility for naturalization. Specifically, she had not been "lawfully admitted for permanent residence" and did not possess "good moral character" as required for naturalization under 8 U.S.C. § 1427(a). J.A. 275.

In response, Injeti sought a hearing before an immigration officer. After conducting another interview and considering additional evidence, USCIS again denied Injeti's application. It based its decision on several related considerations. First, in the absence of proof that Mr. Injeti had died in 1988, USCIS concluded that Injeti had been "married to more than one person

---

[1] In his affidavit, Rothwell stated that he also submitted this marriage certificate with Injeti's original application for LPR status. J.A. 261. However, the certificate is not attached to the version of Injeti's application that appears in the record, and our review of the record does not otherwise reveal any indication that immigration officials received it.

at the same time." J.A. 28. She had thus committed bigamy, a crime of moral turpitude. As a result, negative answers she gave in her interview to questions regarding whether she had ever committed a crime or been married to more than one person at once had in fact been false. This crime and false testimony, along with Injeti's submission of a fraudulent death certificate, all prevented her from establishing good moral character. Additionally, because Injeti had "procured [her] lawful permanent residence through misrepresentation," she had not been lawfully admitted for permanent residence. J.A. 31. Finally, USCIS concluded that Injeti had "deliberately engaged in an ongoing pattern of misrepresentation and deceit." J.A. 31. Therefore, she was "statutorily and permanently ineligible for naturalization." J.A. 32.

## B.

Injeti filed a new complaint in the U.S. District Court for the District of Maryland, seeking review of the denial of her naturalization application pursuant to 8 U.S.C. § 1421(c). Injeti's complaint asserted that she met all the requirements for naturalization and had not committed bigamy. The district court held a hearing on USCIS's motion to dismiss or for summary judgment. At the conclusion of the hearing, the court granted summary judgment in favor of USCIS. Delivering its decision from the bench, the district court explained that Injeti was

8

ineligible for naturalization because she had: (1) not been lawfully admitted for permanent residence; and (2) failed to establish good moral character.

First, regarding Injeti's permanent resident status, the district court held that "she had an absolute duty to inform [USCIS] of her previous husband." J.A. 94. Because she omitted that information from her application for adjustment to LPR status, "she did not have proper immigration status in the first place and therefore could not be a proper candidate for naturalization." J.A. 95. Second, because she made the misrepresentation under penalty of perjury, Injeti's statement constituted false testimony under 8 U.S.C. § 1101(f)(6), barring a finding of good moral character. J.A. 96. Because Injeti was ineligible for naturalization on either basis, the court held, USCIS was entitled to summary judgment.

## II.

### A.

"Courts review a decision denying a naturalization application de novo." Dung Phan v. Holder, 667 F.3d 448, 451 (4th Cir. 2012); see 8 U.S.C. § 1421(c). Similarly, we review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party. Dung Phan, 667 F.3d at 451.

9

To qualify for naturalization, an applicant bears the burden of establishing, among other prerequisites, that she: (1) has resided continuously in the United States for at least five years after being "lawfully admitted for permanent residence," and (2) has been, and still is, "a person of good moral character" during the relevant time periods. 8 U.S.C. § 1427(a); 8 C.F.R. § 316.2. Arguing that the district court's grant of summary judgment to USCIS was improper, Injeti contends that the district court erred in finding that she could not satisfy either of these conditions.

We first consider whether Injeti was lawfully admitted for permanent residence.

B.

"The term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws." 8 U.S.C. § 1101(a)(20). As one of our sister circuits has aptly noted, "[t]his definition is somewhat circuitous, and where there is ambiguity, we must give deference to the agency's interpretation, if it is reasonable." Arellano-Garcia v. Gonzales, 429 F.3d 1183, 1186 (8th Cir. 2005) (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984)).

10

The Board of Immigration Appeals ("BIA") has explained that the term "lawfully" "denotes compliance with substantive legal requirements, not mere procedural regularity." In re Koloamatangi, 23 I. & N. Dec. 548, 550 (B.I.A. 2003) (internal quotation marks omitted). According to the BIA, an alien who has obtained LPR status by fraud--or who was otherwise not entitled to it--has not been lawfully admitted. See id. In other words, even in cases where there is no indication of fraud, an alien has not been "lawfully admitted" if her admission, at the time it was granted, was "not in substantive compliance with the immigration laws." See Shin v. Holder, 607 F.3d 1213, 1217 (9th Cir. 2010).

The BIA has applied this "non-fraud" doctrine in other cases, ranging from those where a petitioner has obtained LPR status through the fraud of third parties to those where a petitioner has received LPR status due to an administrative oversight. See, e.g., Walker v. Holder, 589 F.3d 12, 19 (1st Cir. 2009) (affirming a BIA order concluding that petitioner had not been lawfully admitted because he had acquired LPR status "through the fraud or misrepresentation of third parties"); Arellano-Garcia, 429 F.3d at 1186-87 (agreeing with a BIA order concluding that petitioner had not been lawfully admitted because his LPR status "was obtained by a negligent mistake made by the government").

11

Every other circuit that has addressed the BIA's construction of "lawfully" has deferred to it as reasonable, and seeing no reason to reach a contrary conclusion, we follow suit.[2] Thus, to establish that she was lawfully admitted for permanent residence, Injeti must do more than simply show that she was granted LPR status; she must further demonstrate that the grant of that status was "in substantive compliance with the immigration laws."[3] See Shin, 607 F.3d at 1217.

Injeti concedes that her application for adjustment to LPR status contained a misrepresentation regarding whether she had previously been married. Specifically, she inaccurately stated "none" when asked whether she had any "former husbands." J.A. 117. Nevertheless, Injeti contends that she was lawfully admitted for permanent residence because the misrepresentation--which she explains resulted from a mistake by her attorney--was not fraudulent or willful, and was immaterial to her eligibility

---

[2] See, e.g., Gallimore v. Att'y Gen., 619 F.3d 216, 223-25 (3d Cir. 2010); Shin, 607 F.3d at 1217; Walker, 589 F.3d at 19-21; De La Rosa v. U.S. Dep't of Homeland Sec., 489 F.3d 551, 554-55 (2d Cir. 2007); Savoury v. U.S. Att'y Gen., 449 F.3d 1307, 1313-17 (11th Cir. 2006); Arellano-Garcia, 429 F.3d at 1186-87.

[3] This does not mean that any time a person applies for naturalization, she must affirmatively come forward with proof to refute every conceivable basis for concluding that her admission did not comply with applicable law. Rather, such proof is required only where there is some articulable reason to suspect that the applicant's admission was improper.

for LPR status in the sense that she was not "excludable on the true facts." See Appellant's Br. at 34. Therefore, she argues, her adjustment to LPR status complied with the immigration laws both procedurally and substantively. We disagree.

First, we reject Injeti's contention that the misrepresentation in her application was immaterial to her eligibility for LPR status. Despite Injeti's argument to the contrary, finding that a misrepresentation is material does not require concluding that it necessarily would have changed the relevant decision. Rather, in Kungys v. United States, 485 U.S. 759 (1988), the Supreme Court held that a misrepresentation in an immigration proceeding (there a denaturalization proceeding) is material if it "ha[s] a natural tendency to influence the decision[] of [immigration officials]." Id. at 772; see also United States v. Garcia-Ochoa, 607 F.3d 371, 375-76 (4th Cir. 2010) (noting that the Kungys materiality test "applies in numerous contexts"). As one circuit court has concluded, "[t]his is most definitely not a 'but for' analysis, . . . that is, the government need not establish that 'but for' the misrepresentation" the application for LPR status would not have been granted. Kalejs v. INS, 10 F.3d 441, 446 (7th Cir. 1993).

The BIA considers a misrepresentation material if it "tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper

13

determination that he be excluded." Matter of Kai Hing Hui, 15 I. & N. Dec. 288, 289 (B.I.A. 1975) (quoting Matter of S-- & B-- C--, 9 I. & N. Dec. 436, 448-49 (A.G. 1961)); see also Cooper v. Gonzales, 216 F. App'x 294, 297 (4th Cir. 2007) (applying the BIA's materiality standard); Gozun v. Att'y Gen., 375 F. App'x 276, 279 (3d Cir. 2010) (deferring to "the BIA's definition of a material misrepresentation" as "reasonable").

To the extent that these materiality standards differ, we need not determine which of the two applies here because Injeti's misrepresentation meets either one. Cf. Solis-Muela v. INS, 13 F.3d 372, 377 (10th Cir. 1993) (declining to decide whether the Kungys or BIA materiality standard applied because "[r]egardless of the standard employed," the misrepresentation at issue was material). As USCIS explained in its decision denying Injeti's naturalization application:

> Had USCIS properly known that [Injeti] w[as] previously married, they would have inquired deeper into the matter. The fraudulent death certificate of [Mr.] Injeti would have been discovered around the same time as that of the fraudulent death certificate of . . . Shaikh's first wife. This would have gone to the heart of [Injeti's] eligibility to become a lawful permanent resident. . . . Had it been known that [Injeti] w[as] married to two individuals at the same time, [she] would have been precluded from establishing eligibility for lawful permanent residence.

J.A. 30. In other words, because commission of bigamy, a crime of moral turpitude, renders an alien inadmissible, see 8 U.S.C.

14

§ 1182(a)(2)(A)(i), Injeti's omission of her prior marriage "had a natural tendency to influence" the evaluation of her application for LPR status, see Kungys, 485 U.S. at 772, by "shut[ting] off" inquiry into the propriety of her second marriage, Matter of Kai Hing Hui, 15 I. & N. Dec. at 289. The misrepresentation was therefore material, whether or not the true facts would have actually led to denial of her application.[4]

Nor was it necessary for the district court to determine whether Injeti's misrepresentation was fraudulent or willful. As explained previously, and as our sister circuits have repeatedly observed, "[t]he adverb 'lawfully' requires more than the absence of fraud." Savoury, 449 F.3d at 1313. Indeed, "[i]t requires consistency with all applicable law," id., and an alien has not been "lawfully admitted" when she was "not legally entitled" to LPR status for any reason, Gallimore, 619 F.3d at 224. See In re Koloamatangi, 23 I. & N. Dec. at 550.

In arguing that her admission was consistent with applicable law, and thus that she was legally entitled to LPR status, Injeti attempts to rely on 8 U.S.C. § 1182(a)(6)(C)(i), which designates as "inadmissible" any alien who "seek[s] to

---

[4] Injeti contends that she would have been inadmissible only if she had knowingly been married to two men at once. For reasons we explain later, we find it unnecessary to determine whether Injeti committed bigamy.

15

procure" admission "by fraud or willfully misrepresenting a material fact." Injeti argues that her admission was not inconsistent with this provision because her misrepresentation on her application was neither fraudulent nor willful. Nor, according to Injeti, was she inadmissible under any of the other applicable statutory bars. In particular, she contends that she did not commit bigamy, so as to render her inadmissible under the bar against aliens who have committed a crime of moral turpitude, see 8 U.S.C. § 1182(a)(2)(A)(i), because she believes Mr. Injeti died prior to her marriage to Shaikh.

Injeti's argument incorrectly presumes that admissibility is the only requirement for being entitled to LPR status. To be sure, Injeti would not have been entitled to adjust her status to permanent resident had she been statutorily inadmissible. Admissibility, however, is a necessary, but not sufficient, condition for adjustment to LPR status. Indeed, while the statute governing adjustment of status makes admissibility a prerequisite for receiving a grant of LPR status, see 8 U.S.C. § 1255, the ultimate determination as to whether an alien will receive that status is left to the Attorney General "in his discretion and under such regulations as he may prescribe." Id. (emphasis added).

One such regulation, 8 C.F.R. § 103.2(a)(2), requires the applicant to certify that all information contained in the

16

application "is true and correct." Because Injeti's application contained a material misrepresentation, and thus was not "true and correct," it did not comply with § 103.2(a)(2).[5] See also United States v. Sadig, No. 05-4733, 2007 WL 4553963, at *4 (4th Cir. Dec. 27, 2007) ("[T]he oath at the end of the application specifically and absolutely requires that the answers be true and correct."). It follows that Injeti did not satisfy the legal requirements for adjusting to LPR status under 8 U.S.C. § 1255, regardless of whether the misrepresentation on her application was willful, and even if she did not commit bigamy. Cf. In re F---- M----, 7 I & N Dec. 420, 421-22 (B.I.A. 1957) (concluding that a visa granted on the basis of an application that contained a material misrepresentation "was not a valid one," despite the record "fail[ing] to establish that the [applicant] made the misrepresentation willfully and purposefully").

---

[5] By its terms, 8 C.F.R. § 103.2(a)(2) does not limit the duty to ensure that an application is "true and correct" to material facts. However, given that the regulation seems intended to facilitate USCIS's assessment of whether the applicant is eligible for the benefit sought, we read it to imply such a limitation. That is to say, we do not believe a mistake or misstatement with no possible bearing on an applicant's eligibility, and which is therefore immaterial, see Kungys, 485 U.S. at 772, necessarily violates the duty imposed by § 103.2(a)(2).

17

Accordingly, we find that Injeti failed to show that she was "legally entitled" to the grant of LPR status she received, and conclude that she was not lawfully admitted for permanent residence. Injeti is therefore ineligible for naturalization, and the district court did not err in granting summary judgment for USCIS on this ground.

C.

In addition to finding that Injeti had not been lawfully admitted for permanent residence, the district court also held that Injeti's "unlawful acts" "bar[red] a finding of good moral character." J.A. 96. However, because a failure to satisfy any one of the statutory prerequisites renders an applicant ineligible for naturalization, this latter conclusion was not essential to the district court's grant of summary judgment. See Fedorenko v. United States, 449 U.S. 490, 506 (1981) ("[T]here must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship."). In light of the possibility that Injeti might, in the future, seek immigration benefits to which her character is relevant, we vacate that portion of the district court's judgment addressing Injeti's good moral character. In doing so, we express no opinion on the merits of the district court's analysis.

AFFIRMED IN PART AND VACATED IN PART

18