**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-4066**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MARK STUART LANDERSMAN, a/k/a Mark Stuart,

Defendant - Appellant.

**No. 16-4067**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LEE HALL,

Defendant - Appellant.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (1:13-cr-00419-LMB-1; 1:13-cr-00419-LMB-2)

Argued: December 6, 2017            Decided: March 28, 2018

———————————

Before KING and THACKER, Circuit Judges, and SHEDD, Senior Circuit Judge.

———————————

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Judge King and Senior Judge Shedd joined.

———————————

**ARGUED:** Stuart A. Sears, SCHERTLER & ONORATOR, LLP, Washington, D.C., for Appellant Lee Hall. Cary Citronberg, ZWERLING/CITRONBERG, PLLC, Alexandria, Virginia, for Appellant Mark Stuart Landersman. Morris Rudolph Parker, Jr., Patricia Marie Haynes, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** John Zwerling, ZWERLING/CITRONBERG, PLLC, Alexandria, Virginia, for Appellant Mark Landersman. Dana J. Boente, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria Virginia, for Appellee.

———————————

THACKER, Circuit Judge:

In this consolidated appeal, Lee Hall, former Director of Intelligence for the Deputy Undersecretary of the Navy, and Mark Landersman, a machinist from California (collectively, "Appellants"), appeal guilty verdicts for criminal conspiracy and, as to Hall, unlawful conversion of government funds. Specifically, following a bench trial, the district court found that Hall facilitated the purchase of hundreds of firearm suppressors from Mark Landersman, Hall's boss's brother, for over $1.6 million in government funds. The district court concluded that this transaction was illegal because, inter alia, Hall did not use the proper channels for government funding approval; Mark Landersman was an untested and unlicensed firearm manufacturer; and upon arrival, the suppressors did not meet government performance standards.

Appellants raise a host of challenges to the manner in which their bench trials were conducted and the sufficiency of the evidence against them. Because some of these challenges relied on classified government records, the district court and this court conducted proceedings pursuant to the Classified Information Procedures Act ("CIPA"), *see* 18 U.S.C. app. 3, §§ 1–16. For the reasons that follow, we find no reversible error in the classified and unclassified proceedings below and therefore affirm Appellants' convictions.

3

I.

A.

We recount the facts in the light most favorable to the Government, the prevailing party at trial. *See United States v. Garcia-Ochoa*, 607 F.3d 371, 376 (4th Cir. 2010). In late 2012 and early 2013, Hall facilitated the Navy's purchase of 349 unattributable (i.e., unserialized and untraceable) firearm suppressors for approximately $1,657,750. At that time, Hall worked directly for David Landersman, Senior Director of Intelligence for the Navy's Office of Plans, Policy, Oversight and Integration ("PPOI").[1]

As background, sometime during the summer of 2012, David Landersman and Hall approached Robert Martinage, Deputy Undersecretary for PPOI and David's superior, to seek funds for "intelligence studies." J.A. 373.[2] Martinage approved their request to approach Carla Lucchino, Department of the Navy Assistant for Administration ("DON/AA"), and ask for authorization to seek funding for this purpose.

On June 6, 2012, David sent an email to Lucchino, asking for a total of $3 million from the PPOI Senior Director's operational budget for the following: intelligence studies, a program integration assessment, an anti-submarine warfare research project, an

---

[1] Because David's brother Mark Landersman is an appellant in this case, we sometimes refer to them by their first names.

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

assessment of the Navy's participation in the Defense Clandestine Service program,[3] and "an overall assessment of how well D[epartment] O[f] N[avy] intelligence requirements are being satisfied." J.A. 1185. Lucchino forwarded the request to David Nugent, the Director of the Financial Management Division of DON/AA.

Nugent then began working with Hall on David Landersman's budget request. During the time that Hall and Nugent discussed the funding request, Hall emphasized to Nugent that this was "an Under Secretary priority," which "would move [it] up on the [priority] list." J.A. 439–40. On August 13, 2012, Nugent indicated to Lucchino that he had been working with Hall and explained that the budget for the studies was reduced from $3 million to $2.2 million. Lucchino authorized Nugent to disburse $2.2 million to David Landersman. Notably, Lucchino testified that she could not authorize the purchase of "weapons or small arms." *Id.* at 349.

Also on August 13, 2012, David Landersman sent an email to his brother Mark, the erstwhile owner of an automobile machinery company in California called "Advanced Machining and Engineering," or "AME." J.A. 1191–92. Mark had been in dire straits, as he "couldn't keep up the overhead" at AME, *id*. at 723; he was forced to

---

[3] The Defense Clandestine Service program was launched in 2012 to "enable[] [the Department of Defense] to be more effective in the collection of national-level clandestine human intelligence across a range of targets of paramount interest." Karen Parrish, *DOD Aggressively Pursues Intel Innovation, Vickers Says*, Am. Forces Press Serv. (Oct. 11, 2012) (internal quotation marks omitted), http://archive.defense.gov/news/newsarticle.aspx?id=118181, attached as PDF document.

5

file for Chapter 7 bankruptcy on July 9, 2012; and a 2011 tax return showed that another of his businesses owed his brother David $50,000 in unpaid loans.

In that August 13 email, David asked Mark for the proper name of his company. The next day, Mark responded to David with the name and phone number of his company: "Advanced Machining and Engineering (951) 852 1653." J.A. 1192. About an hour later, David forwarded this information to Hall, noting, "Lee, Info a[s] follows . . . ." *Id.* at 1193. Later that same day, David sent his brother Mark an email with the subject line "300BLK Suppressor," which included a link to a website entitled "How I Built a 300 AAC Blackout Suppressor." *Id.* at 1195, 1447. Under the link, David wrote, "Look this over . . . Looks very much like what we're going to send you." *Id.* at 1195. Mark responded, "Wow!  [V]ery simple." *Id.* at 1194.

Five weeks after Lucchino authorized Hall to spend $2.2 million for studies and assessments, on September 17, 2012, Hall met with Tedd Shellenbarger, a counterdrug director within PPOI; Sherri Donahue, the Navy Contracting Officer Representative; and Gail Williams, a senior program manager at CACI International, Inc. ("CACI"), a government contractor. The purpose of the meeting was to discuss what Hall wanted to be done with the money.[4]

---

[4] Although $2.2 million was allocated, the evidence at trial demonstrated that only $1,657,750 was expended for the suppressors, with an additional undetermined amount paid to CACI.

6

During that meeting, Hall asked about procuring materials, as opposed to studies as he previously represented to DON/AA. Donahue recalled that "the conversation ha[d] to do with . . . alterations on guns." J.A. 480. Williams also recalled that Hall was seeking to procure equipment or materials. She did not recall Hall mentioning "anything about using [the money] to support intelligence studies." *Id.* at 499. During the meeting, Hall and Williams "discuss[ed] . . . what was required for CACI to do a sole source justification," meaning that the contract would not have to be put out for bid, but rather, CACI would award the contract to a preselected vendor. *Id.*

As a follow up to that meeting, on October 19, 2012, Hall emailed Williams, providing her with the name of the vendor he proposed to use for the contract. He stated:

> Gail,
> We are finally ready to move. Here is the information you need to get started:
>
> Poc: Mark Stuart of Applied Engineering and Materials
> Phone: 951-851-1653.
>
> What else do you need? Also, if at all possible, we'd like this rolling by the end of November. I understand you have internal hurdles, but we have accelerated interest in delivering the products.

J.A. 1208. Notably, Mark's middle name is Stuart, but his full name is Mark Stuart *Landersman*; the company name is actually Advanced Machining and Engineering; and this phone number is one off from the actual number David Landersman forwarded to Hall, which was 951-85**2**-1653.

7

Williams responded by email the same day, stating, "[I] will need some information in order to justify a 'sole source' purchase." *Id.* For example, "Why is Applied Engineering and Materials the vender [sic] of choice?" *Id.* (parentheses omitted). Thereafter, Hall sent Williams an email stating in relevant part:

> Other subcontractors were not considered due to the fact that they do not possess the expertise required to do the job nor posses [sic] the unique proprietary tooling systems created by AME to produce the required enhancements needed. Their proprietary system is wholly, and solely exclusive to AME and therefore unavailable by any other subcontractor.
>
> . . .
>
> [] AME currently has sole proprietary expertise that is not commercially offered by other companies or individuals. It is the only responsible source for the engineering expertise sought and no other services will satisfy requirements [sic]. Their product is the first that incorporate [sic] a unique design that significantly reduces the decibel ratings to near background noise levels. All technologies are developed and owned exclusively by AME and no licensing agreements currently exist, providing a unique opportunity for CACI and the end customer to utilize proprietary engineering and services not readily available elsewhere.

J.A. 1207. At CACI's request, Hall then sent an Statement of Work, proposing that CACI would pay AME 50% up front and 50% "upon delivery, inspection and acceptance trials" of the product. *Id.* at 1206. In addition, each suppressor was to be billed at a cost of around $5,000.

In finalizing the contract and performing the required due diligence, a CACI officer asked Mark to "provide a detailed breakout of [his] costs, i.e., labor and materials," and also to "provide . . . a copy of an invoice and/or PO" demonstrating that

8

he "suppl[ied] this product . . . to [a] client of [his] within one year." J.A. 1215. Mark replied, "I am not be able [sic] to provide this information," and told the CACI officer to contact Hall. *Id.*; *see also id.* at 1247 (November 8, 2012 email from Mark Landersman to CACI procurement director explaining, "[Hall] has instructed me to direct any and all requests for information" to Hall). In turn, Hall claimed the information CACI requested was confidential, citing "increased questioning on the[] vendor issues," and explaining, "[T]he sensitive nature of the product(s), past performance and service, and the proprietary information involved . . . makes for potential problems later regarding security and classification." *Id.* at 1415 (Nov. 9, 2012 email). On November 12, 2012, Mark finally quoted CACI a labor rate of $85 per hour for 29 hours per part, coming to $2,465 per suppressor, which Hall said he and David "determined . . . to be fair, reasonable, and accurate." *See id.* at 1416. Hall also emailed CACI on December 3, 2012, and notified the project analyst that the items were to be shipped to Al Zalewski, a Navy intelligence official, at a Chesapeake, Maryland address. He also advised the analyst to use the notation "Hold for Al Zalewski," rather than using Hall's name. *Id.* at 1014 n.17.

On December 7, 2012, CACI approved a purchase order in the amount of $1,657,750 for 349 "Signature Suppressor[s]." J.A. 1303–04. However, in November 2012, before the purchase order was approved, Mark gave $2,000 to Juan Carlos Robles, a machinist and successor-owner of AME, to "cover the entire costs of the materials" for the suppressor project. *Id.* at 726. Nonetheless, on December 12, Mark emailed CACI,

9

stating, "I can't get started without the deposit check and wondered if you have an idea when it might be sent." *Id.* at 1306–07. Two days later, CACI cut a check for 50% of the contract price, or $828,875, and sent it to Mark.

Using blueprints provided by Mark, Robles alone manufactured the suppressor tubes and accompanying assembly parts for the suppressors. It took him four to five weeks, working around five hours per day. Mark paid Robles under $10,000,[5] in contrast to the labor charge of $2,465 per suppressor quoted by Mark (which comes to $860,285 in labor for 349 suppressors).[6]

Meanwhile, in January 2013, Hall met with Zalewski and asked if he could have a shipment sent to a Naval Intelligence warehouse in Chesapeake, Maryland, even though he had already scheduled to have the shipment delivered there. Zalewski agreed, but testified Hall "made it clear to me that I was not to know . . . what was in the boxes . . . I was not cleared for that." J.A. 746. Hall also asked Zalewski to remove the boxes' labels, which contained Mark Landersman's name, but Zalewski refused to do so.

On February 19, 2013, boxes containing the 349 Landersman suppressors arrived at the warehouse. Despite the fact that the suppressors were delivered on February 19,

---

[5] Throughout the record, evidence about the amount paid to Robles varies from $6,000 to $8,000 or more. Because Robles was paid mostly in cash, the specific amount is uncertain. It is clear, however, that Robles was not paid more than $10,000.

[6] The record reveals that Mark himself likely assembled and painted the suppressors after Robles manufactured the parts. Nonetheless, the district court found that based on Robles's testimony, the "estimate of 29 hours per item appears to be a complete fabrication." J.A. 1012–13 n.14 (internal quotation marks omitted). Appellants have not demonstrated that this finding is clearly erroneous.

10

Hall certified on a Form DD-250 (Material Inspection and Receiving Report) that he accepted and inspected the suppressors on February 14. Notably, on February 14, 2013, Hall was on administrative leave for an unrelated matter and thus, could not have accepted and inspected the suppressors as indicated. Because Hall signed the DD-250, CACI mailed Mark Landersman a check for the $828,875 balance on the contract.

A few weeks later, Nugent saw the DD-250 and realized the money intended for intelligence studies was actually used for suppressors. As a result, the matter was referred to the Naval Criminal Investigative Services ("NCIS"). The boxes containing the Landersman suppressors were finally opened when they were seized by NCIS agents in April 2013, two months after they were delivered. The boxes were located "next to a photocopier and in an otherwise inappropriate area for classified materials as they were . . . accessible to anyone in that space." J.A. 1014. Thereafter, Jason Davis, a mechanical engineer for the Naval Surface Warfare Center at Crane, Indiana, tested the suppressors to see if they would meet Navy performance standards for sound and flash.[7] Davis's report reveals that the suppressors failed to meet those performance standards. Indeed, the report states that the suppressors were deemed "[u]nacceptable" in multiple ways, which "would have made this suppressor ineligible for [a Navy] contract award."

---

[7] The standards for sound and flash used by Davis, explained more fully in section II.B., *infra*, are that a suppressor must create a 25 decibel reduction in sound and 85% reduction in light emission after the first shot. *See* J.A. 1016–17, *see also id*. at 797, 804.

*Id*. at 1783. After an investigation, Mark Landersman was identified as the manufacturer of the suppressors, and he was indicted singly for conspiracy on November 14, 2013.

## B.

On March 13, 2014, a grand jury sitting in the Eastern District of Virginia returned a two-count superseding indictment, charging Hall and Mark Landersman together with a conspiracy containing three objects: (a) the unlicensed manufacture of firearms; (b) shipping of unregistered firearms; and (c) mail fraud ("Count One"); and charging Hall alone with converting Navy funds without authority ("Count Two"). Hall and Mark consented to a bench trial, and on June 20, 2014, they jointly filed a notice pursuant to CIPA to use classified information.[8]

On September 25, 2014, the district court granted Mark Landersman's motion to sever, scheduling Hall's bench trial for October 20, and Mark's for October 27. At the hearing on the motion to sever, Hall represented that he would testify at Mark's trial. However, on October 9, Hall rescinded that representation. The district court nonetheless allowed the cases to proceed separately.

---

[8] David Landersman was indicted on September 24, 2015. His charges mirrored Hall's (conspiracy and conversion of government property without authority). David's jury was empaneled February 27, 2017, but because he began to suffer from serious health problems, the district court dismissed his case. *See* Order, *United States v. David Landersman*, No. 1:15-cr-283 (E.D. Va. March 2, 2017), ECF No. 121 at 3.

1.

*Pre-Trial Motions*

a.

On June 20, 2014, Appellants moved to dismiss the indictment based on the allegation that some of Hall's personal notes were destroyed by Pentagon officials while he was on administrative leave. At a hearing on July 14, 2014, Hall posited that the missing notes would have demonstrated that: (1) he communicated with a man named Robert Gudz, president of the International Police Supply and a firearms dealer, who represented to him that suppressors meeting Hall's requirements[9] would cost between $10,000 and $12,000 a piece; (2) Hall informed Lucchino they could no longer carry out the studies for which they initially requested funds, but Lucchino had no objection to using the money for another purpose; (3) Shellenbarger, the other PPOI director who attended the CACI meeting, had a contract vehicle for purchase of the suppressors, and they talked about the contract at the meeting; (4) Hall spoke with Zalewski about holding the boxes in a secure facility; and (5) Hall had a meeting with Martinage about the suppressor purchase.

From the bench, the district court denied the motion to dismiss the indictment but explained:

---

[9] At the July 14 hearing, Hall did not testify about what those precise requirements were.

> [T]here'll be an inference drawn against the government on th[e] issue [of the handwritten notes], and it will come out to play as it comes out to play.
>
> Again, it may be moot. These witnesses . . . may say exactly what Mr. Hall recalls them saying. *If they don't then he'll be permitted to testify, and as I said, if he says under oath that he had a note that memorialized that, I'm going to accept that.*

J.A. 260 (emphasis supplied). The court then explained in a follow up written order, "the Court will draw all inferences in favor of defendant Lee Hall regarding any of his handwritten notes memorializing meetings and conversations that were destroyed as a result of the government's negligent handling of evidence." *Id.* at 60.

### b.

On October 17, 2014, three days before Hall's trial was to begin, he and Mark Landersman filed a joint motion to dismiss based on an alleged *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83 (1963). Three days prior, the Government disclosed a report of an NCIS interview with Steve Roddel, owner of a suppressor company and a Government witness. The report shows that Roddel was interviewed five months earlier, on May 13, 2014, and provided information that Appellants claimed "directly undermined" one of the government's theories, which was that the cost of the Landersman suppressors was excessive. J.A. 310. Specifically, when asked "what would make an AK-47 suppressor worth approximately $5,000," Roddel responded that it was possible if they "lack[ed] traceability" and "were totally rogue." *Id.* (internal quotation marks omitted). He surmised that a manufacturer could charge a higher price if "there

14

are not many . . . out there, thus less sales and the price would need to cover the development." *Id.*

On the morning Hall's trial began, the district court declined Appellants' request to dismiss the indictment, but it explained, "I most likely will be drawing inferences against the government because of the way they have handled a lot of the *Brady*" material. J.A. 338. The court further explained, "I am going to make a finding at this time based upon the statement in the Roddel document that you got, and this is a finding I'm making based upon this record, that the devices at issue were priced reasonably [at $5,000 per suppressor] given the conditions under which they were purchased." *Id*.

## 2.

### *Bench Trials*

Hall's trial began on October 20, 2014, and lasted until October 23. Mark Landersman's trial began October 28 and concluded the following day. On October 29, 2014, after addressing motions for acquittal, the district court issued a guilty verdict from the bench as to both Hall and Mark Landersman. Specifically, Mark was found guilty of all three objects of the Count One conspiracy. Hall was

- acquitted of the first object of the Count One conspiracy, manufacturing firearms without a license;[10]

---

[10] This acquittal was based on the Government's failure to introduce into evidence an email, discussed below, which would have attributed knowledge of the license requirement to Hall.

15

- convicted of the second object of Count One, transporting unregistered firearms;

- convicted of the third object of Count One, mail fraud; and

- convicted of Count Two, unlawful conversion of government funds without authority.

The district court issued its memorandum opinion with findings of fact and conclusions of law one year later, on November 6, 2015. Notably, the district court clarified its earlier finding that the suppressors were reasonably priced. It explained:

> Because of problems with discovery and the late production of interview reports with Steven Roddell [sic], the Court found that a cost of $5,000 per suppressor *might be reasonable if the suppressor were unserialized.* That finding, of course, assumed the suppressor would actually meet the standards for flash and sound suppression. The Court did not find that Mark Landersman's price of $5,000 per suppressor was reasonable given the poor quality of the product.

J.A. 1013 n.16 (emphasis supplied).

3.

*Post-trial*

On December 4, 2015, Appellants filed renewed motions for acquittal or new trial. Hall argued:

> In support of its guilty verdict on the second and third objects of the Count I conspiracy and Count II, the Court found that the "government showed [] there were other established manufacturers who could make suppressors, and Hall and David Landersman were aware of that fact." Mem. Op. at 16. In making its finding, the Court relied exclusively on [a] government Exhibit [], which was not admitted at Mr. Hall's trial.

16

J.A. 1045. The exhibit referenced here is an email dated September 3, 2012, from Robert Gudz, the aforementioned president of the International Police Supply and a firearms dealer, to both David Landersman and Hall (the "Gudz email"). The Gudz email contained the subject line "Suppressor project" and explained that Gudz's company, SureFire, could "custom build" the type of suppressor "that [David and Hall] requested." *Id.* at 1009, 2324. The Gudz email explained that SureFire could quickly make a prototype and transfer it with approved Alcohol, Tobacco, and Firearms ("ATF") paperwork. The Gudz email further explained that the suppressors would need to comply with ATF rules. Thus, the Gudz email demonstrated that Hall's October 2012 email statement to CACI -- that no other company had the required expertise to produce the suppressors he needed -- was knowingly false.

Nevertheless, Hall argued that because the Gudz email was not admitted at his trial (rather, only in Mark Landersman's trial), but was mentioned in the district court's opinion as a ground supporting conviction, his due process right to a fair trial was violated. On January 5, 2016, the district court granted the motion in part, explaining, "I should not have considered that [email], and I did reference it three times in the opinion." J.A. 1140. Thus, "out of an abundance of caution and giving [Hall] the benefit of the doubt," the court acquitted Hall of the second object of the Count One conspiracy (shipping of unregistered firearms). *Id.* at 1140, 1161.

Hall also claimed that the district court "fail[ed] to consider" a stipulation that "established . . . his good faith defense" based on the idea that Hall knew of a need for the

17

Landersman suppressors. J.A. 1048. Specifically, the stipulation involved Sterling Gill, a Navy official who told Hall that with regard to a classified government program to which Gill and Hall were both privy, "the need for suppressors remains unfulfilled." *Id*. at 969 (the "Gill Stipulation"). The court rejected this argument, explaining:

> [Y]ou still have not convinced me that he acted in good faith, because to me, the core issues [are] . . . why choose Mark Landersman, an absolutely unknown, untested machinist? That's number one.
>
> Number two, if this was that important a project, why not [] have had actual criteria, actual requirements for what was to be done?

*Id*. at 1136–37. Ultimately, at the conclusion of all post-trial motions, Hall ultimately stood convicted of conspiracy to commit mail fraud (object three) and conversion of Navy funds.

### 4.

*Sentencing*

On January 29, 2016, Hall was sentenced to six months in prison on each count of conviction, to run concurrently, to be followed by two years of supervised release. Mark was sentenced to 60 days in prison on Count One. Appellants were also deemed jointly and severally liable for $1,657,750 in restitution, and a forfeiture order was entered with respect to that amount. On February 11, 2016, Appellants filed separate motions to stay

18

the execution of their sentences pursuant to Rules of Criminal Procedure 38 and 32.2,[11] which district court granted.

Appellants filed timely notices of appeal of their convictions, and we consolidated those appeals. "[W]e review judgments resulting from a bench trial under a mixed standard of review: factual findings may be reversed only if clearly erroneous, while conclusions of law are examined de novo." *Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*, 827 F.3d 333, 340 (4th Cir. 2016).

## II.

## A.

*Sufficiency of the Evidence*

We first address Appellants' arguments that their convictions were not based on sufficient evidence.

> In assessing the sufficiency of the evidence presented in a bench trial, we must uphold a guilty verdict if, taking the view most favorable to the Government, there is substantial evidence to support the verdict. "Substantial evidence" means evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.

---

[11] Rule 38 provides that a district court must stay a sentence of imprisonment if the defendant is released pending appeal, and that court may also stay an order to pay a fine. *See* Fed. R. Crim. Proc. 38(b)(1), (c). Rule 32.2 provides that if a defendant appeals from a forfeiture order, the district court may stay that order as well. *See* Fed. R. Crim. Proc. 32.2(d).

*United States v. Armel*, 585 F.3d 182, 184 (4th Cir. 2009) (citation and internal quotation marks omitted).

1.

*Count One – conspiracy to commit mail fraud*

In order to prove that Appellants were guilty of mail fraud conspiracy pursuant to 18 U.S.C. § 371, the Government was required to demonstrate: an agreement to commit mail fraud; willing participation in the conspiracy; and an overt act in furtherance of the conspiracy. *See United States v. Gillion*, 704 F.3d 284, 298 n.4 (4th Cir. 2012).

To uphold a conspiracy conviction, "there need only be a showing that the defendant knew of the conspiracy's purpose and some action indicating his participation. These elements can be shown by circumstantial evidence such as his relationship with other members of the conspiracy, the length of this association, his attitude, conduct, and the nature of the conspiracy." *United States v. Whittington*, 26 F.3d 456, 465 (4th Cir. 1994) (alteration and internal quotation marks omitted); *see also United States v. Roberts*, 881 F.2d 95, 101 (4th Cir. 1989) ("[O]ne may become a member of the conspiracy without full knowledge of all of its details, but if he joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion, it is sufficient to convict him of conspiracy, . . . even though he played only a minor part.").

a.

An agreement to join -- and participation in -- a conspiracy "need not be explicit; it may be inferred from circumstantial evidence." *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996) (en banc) (internal quotation marks omitted). Here, there must have been an agreement to participate in a scheme to defraud using the mail. The scheme "can be in the form of an assertion of a material falsehood with the intent to deceive or active concealment of a material fact with the intent to deceive." *United States v. Pasquantino*, 336 F.3d 321, 333 (4th Cir. 2003) (en banc), *aff'd*, 544 U.S. 349 (2005). According to the district court, "the scheme involved . . . having an unqualified entity to serve as a sole source for a $1.6 million contract to supply items to the government that were never authorized by the government." J.A. 980.

The Government presented copious evidence to support an agreement among Hall, Mark, and David[12] to participate in a scheme to defraud. To begin, in 2011, David Landersman informed a fellow Navy official, Loren Bremseth, that Mark "was able to produce suppressors that were substantially cheaper than anything that was currently out there and could outperform anything that was out there." J.A. 858. David asked Bremseth if he would be willing to call the chief of staff of another government agency, which may have had a need for suppressors, on behalf of his brother Mark. Bremseth declined to do so.

---

[12] The parties stipulated that David Landersman was "the only unindicted co-conspirator in the Count One conspiracy." J.A. 972.

Thereafter, David and Hall approached Martinage about procuring $3 million in funding. David emailed Mark with instructions on how to make a suppressor. Mark responded that the process looked easy. Mark sent AME's information, which David forwarded to Hall. Hall used this information to procure funds for the purchase of suppressors, claiming the funds would be used for intelligence studies and assessments. And ultimately, once the contract was awarded to AME and the manufacturing process was underway, Mark referred CACI questions to Hall, and Hall made arrangements for shipping. The first element of the conspiracy charge is supported by substantial evidence. *See Armel*, 585 F.3d at 184.

b.

The Government also produced sufficient evidence that Appellants willfully participated in the mail fraud conspiracy and committed overt acts in furtherance of the mail fraud conspiracy. As for Hall:

- In the email submitted to CACI, Hall described AME's suppressor as being a "product that is the first that . . . significantly reduces the decibel ratings to near background levels." J.A. 1207. But the district court correctly found this statement was "completely false" because "there was no evidence produced during the trial that either AME or the [Navy] had ever tested any of AME's suppressors." *Id*. at 1009. Moreover, the suppressors failed to meet Navy flash and sound suppression standards when they arrived.

- The October 19, 2012 email from Hall to CACI "was one of many containing false statements. Not only did Hall provide an incorrect name for Mark Landersman and AME, there was no evidence introduced at trial of anyone in the [Navy] having an accelerated interest in delivering the products," as

22

Hall originally claimed. J.A. 1007. Hall also gave an incorrect phone number of Mark's company.

- Hall tried to hide the Landersman name throughout the entire scheme. In response to an email from a CACI analyst, in which he asked Hall to "contact Mark Landersman," Hall responded, "[P]lease refrain from user [sic] vendor names. Just use AME." J.A. 1028–29. Hall did not give Mark's last name in the initial submission to CACI, and Hall directed Zalewski to remove the labels, which contained Mark's last name, from the boxes once they were delivered.

- Hall told CACI the "past performance and service, and the proprietary information" of AME would "make[] for potential problems later regarding security and classification." J.A. 1415. The district court found this reference to past performance "was a completely false statement as there was no evidence in the record of AME having provided any products or services to the Navy in the past." *Id*. at 1011–12.

- Hall changed the funding request from studies to suppressors without formal documentation to or from DON/AA, without written approval from Lucchino or Nugent, and notwithstanding that Lucchino testified she could not approve the purchase of weapons or small arms.

- Hall told CACI that Mark's labor quote of $85 per hour for 29 hours per part was "fair, reasonable, and accurate." J.A. 1416. But "[t]here was no evidence produced during the trial that Hall or anyone within [the Navy] had performed any kind of analysis to determine whether AME's price was fair, reasonable, or accurate." *Id*. at 1013.

- Hall asked Zalewski if he could receive boxes at the Maryland warehouse *after* he had already scheduled to have them shipped there. Hall refused to tell Zalewski the specifics of the contents of the box shipped from California. Rather, he told him the contents were classified. But he allowed the boxes to be held in a warehouse next to a photocopier and in an otherwise inappropriate area for classified materials. Hall also asked Zalewski to remove the shipping labels from the boxes.

23

- Hall signed a DD-250 Form (Material Inspection and Receiving Report), acknowledging that he had accepted the suppressors on February 14, 2013, and that they conformed to the contract. However, he was on administrative leave at that time and had no authority to act on behalf of the Navy; the suppressors were actually received February 19; and there is no evidence he actually inspected or even saw the suppressors once they arrived. Based on his signature, however, CACI was able to cut Mark's second check for $828,875.

And as to Mark, there is likewise sufficient evidence that he "knew of the conspiracy's purpose" and took "some action indicating his participation." *Whittington*, 26 F.3d at 465.

- Mark would generally not speak to CACI directly, directing all questions to Hall;

- Mark quoted CACI a labor rate of $85 per hour for 29 hours per part, coming to $860,285, when he paid Robles less than $10,000 for his labor;

- Mark told CACI he needed money to get started, when he had already given Robles all the money for materials and directed Robles to start on the work; and

- Mark received emails from David about how to manufacture suppressors on the same day David was obtaining funding authorization from DON/AA.

c.

Taking all of this evidence into account, the Government has proven that Appellants conspired to "make [] assertion[s] of [] material falsehood[s] with the intent to deceive"; that is, they engaged in a fraudulent scheme to funnel government money to

24

Mark's flailing business. *Pasquantino*, 336 F.3d at 333. Thus, sufficient evidence existed for the convictions on Count One.[13]

2.

*Count Two – conversion of Government funds*

Hall was convicted of a violation of 18 U.S.C. § 641 (Count Two), which provides,

> Whoever . . .
>
> [1] knowingly converts to his use or the use of another, or
> [2] without authority, sells, conveys or disposes of
> [3] any record, voucher, money, or thing of value of the
> United States . . . , or
> [4] any property made or being made under contract for the
> United States . . .

shall be guilty of a crime. 18 U.S.C. § 641. "Section 641 prohibits two separate acts. The first is to embezzle, steal, or knowingly convert United States property and the second is to sell, convey, or dispose of United States property without authority." *United States v. Zettl*, 889 F.2d 51, 53 (4th Cir. 1989). Although the indictment here charged both acts, the conviction was based on the first. *See* J.A. 1030 (district court explaining that the Government was required to prove "Hall knowingly converted or caused to be

---

[13] The district court's careful delineation of guilt as to the three objects at trial obviates any need to address Mark Landersman's arguments on the first two objects of the conspiracy because "the conspiracy conviction[] in this case [is] supported by a valid and independent" conclusion on mail fraud. *United States v. Cone*, 714 F.3d 197, 211 (4th Cir. 2013) (internal quotation marks omitted); *see also United States v. Lawson*, 677 F.3d 629, 655 (4th Cir. 2012); *United States v. Head*, 641 F.2d 174, 179 (4th Cir. 1981).

25

converted to the use of another (Mark Landersman) monies of the [Navy]"). Thus, in order to convict Hall on Count Two, the Government had to prove: (1) The money described in the indictment is a thing of value that belonged to the United States government; (2) Hall knowingly converted or caused the conversion of that money to his own use; (3) Hall acted knowingly and willfully with the intent to deprive the government of the use and benefit of the money; and (4) the value was greater than $1,000. *See United States v. Kiza*, 855 F.3d 596, 601 (4th Cir. 2017); *see also* I-23A Leonard B. Sand et al., *Modern Federal Jury Instructions-Criminal*, ¶ 23A.01 (2015).

The first and last of these elements are not in dispute. Rather, as a challenge to his conviction on Count Two, Hall contends that the Government's theory of liability was "unclear" as to when the funds were actually converted. Hall's Opening Br. 29. He further argues that the funds were converted in an authorized manner, and he had a good faith belief the suppressors were needed.

The indictment charges Hall with conversion by "direct[ing] CACI to pay Mark Landersman" over $1.6 million in Navy funds for the manufacture of suppressors. J.A. 48. The Government's theory at trial was that this government money was misused at Hall's direction because he knowingly enabled money allocated for studies to be used for the purchase of suppressors that were "unwanted, unneeded, and ineffective" in order to enrich his boss's brother. *Id*. at 928 (closing argument).

This is a valid legal theory. In construing § 641, the Supreme Court has stated, "[K]nowing conversion requires more than knowledge that defendant was taking the

26

property into his possession.  [The defendant] must have had knowledge of the facts, though not necessarily the law, that made the taking a conversion." *Morissette v. United States*, 342 U.S. 246, 270–71 (1952).  Conversion

> may include misuse or abuse of property.  It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use. . . .  It is not difficult to think of intentional and knowing abuses and unauthorized uses of government property that might be knowing conversions but which could not be reached as embezzlement, stealing or purloining.  Knowing conversion adds significantly to the range of protection of government property without interpreting it to punish unwitting conversions.

*Id*. at 272.  Thus, conversion occurs when the accused knowingly "misue[s]," "abuse[s]," or "use[s] [the money] in an unauthorized manner." *Id.* at 272; *see also United States v. Matzkin*, 14 F.3d 1014, 1020 (4th Cir. 1994) ("Section 641 is not a theft statute nor is it a codification of the common law of larceny.  [Section 641] is much more inclusive because it covers unauthorized sale and conversion which the Court has defined as the 'misuse or abuse of property' or its use 'in an unauthorized manner.'" (quoting *Morissette*, 342 U.S. at 272)).  Indeed, § 641 "broaden[s] the [common law] offense of conversion to include intentional and knowing abuses *or* unauthorized uses of government property." *United States v. Fogel*, 901 F.2d 23, 25 (4th Cir. 1990) (emphasis supplied).  Moreover, in *Fogel*, this court upheld a § 641 conversion conviction where the defendant directed that trees on federal property be cut down to enhance the view from his home and, therefore, his property value.  *See id*. at 24–25.  This supports the

Government's theory that a defendant can be guilty for directing or causing that the government property be abused or misused.

Considering this legal landscape, Hall was provided sufficient notice that his charge was based on directing Navy funds to be used in an unauthorized manner or misusing Navy funds, and there is ample evidence supporting Hall's conviction. Hall circumnavigated the procurement and due diligence process, resulting in a misuse of funds, by misrepresenting Mark Landersman's name, company name, and phone number; switching the purpose of the funding without official approval from DON/AA; avoiding and refusing to answer CACI's questions when they attempted to perform due diligence; and making false statements on the sole source justification about the accelerated need for the suppressors and viability and expertise of AME.

There is also sufficient evidence that Hall knew the use of Navy funds to purchase the Landersman suppressors was not authorized. *See United States v. Maisel*, 12 F.3d 423, 425 (4th Cir. 1993). First, Hall contends that Navy officials Tedd Shellenbarger or Chris Bettini ultimately authorized the transfer of funds. But except for an offhand comment made by Shellenbarger at the CACI meeting,[14] we have no evidence that either Shellenbarger or Bettini knew that the money for the purported intelligence studies would actually be used to purchase suppressors from Mark Landersman, an untested and

---

[14] Donahue testified that, at the CACI meeting, Shellenbarger said "something about how he knew an auto worker out in California who could do [alterations on guns]." J.A. 480.

28

unlicensed machinist, and the parties stipulated that David Landersman was the only unindicted coconspirator. Even if Shellenbarger and Bettini did have such knowledge, their participation still does not render Hall's conduct any less criminal. Hall did not disclose the true reason for the funding to DON/AA, and then did not explain to CACI officials the parameters of the DON/AA approval. He submitted fraudulent statements to CACI in support of a sole source justification, so that no other businesses could compete for the suppressor contract.

To be sure, "[a] person who acts on a belief or on an opinion honestly held is not punishable under the law merely because that honest belief turns out to be incorrect or wrong." *United States v. Hirschfeld*, 964 F.2d 318, 322 (4th Cir. 1992). Hall claims that, as a good faith defense to all charges, he knew of a classified, unfulfilled need for these particular suppressors. But the evidence presented to the district court reveals that Hall -- rather than acting in good faith -- knew how the system worked and circumvented the normal procurement process in order to deliver government money to his boss's brother. As a result, it is clear that Hall's conviction on Count Two is supported by sufficient evidence.

B.

*Expert Testimony*

Appellants also contend that the suppressor testing conducted by Navy mechanical engineer Jason Davis, whom Hall stipulated was an expert in the field, was "highly prejudicial and irrelevant." Hall's Opening Br. 35. Specifically, Hall claims Davis's

testimony "created the false appearance that the suppressors were useless" and "held the Landersman suppressors to a standard they were never intended to, nor . . . could ever meet." *Id.* at 36. Hall also claims the testing was irrelevant because Davis tested the suppressors using MK17 requirements, when in reality, the suppressors were intended for use on a different weapon. We review the district court's decision to admit expert testimony for abuse of discretion. *See United States v. Bynum*, 604 F.3d 161, 167 (4th Cir. 2010).

We first address Appellants' claim that the Navy intended to use the suppressors for a different purpose than the one Davis assumed. Crucially, Hall himself represented to CACI that the Landersman suppressors possessed "a unique design that significantly reduces the decibel ratings to near background noise levels." J.A. 1207. Per this statement, it was Hall, not the Government, that made the usability of the suppressors a material issue.

Next, we address the claim that Davis's testimony and report were inadmissible because the suppressors were not tested on the proper type of firearm and were held to improper standards. Davis's report states that the suppressors "were procured for use on the AK-47 Soviet-style assault rifle," but the Navy's requirements for AK-47 suppressors "were undefined." J.A. 1758 (the "Davis Report"). Therefore, Davis assumed the AK-47 suppressors would meet the same requirements as suppressors used for similar weapon systems, and the most similar rifle was the MK17. Using testing procedures and standards for the MK17, then, Davis tested the suppressors on the Chinese equivalent of

30

an AK-47, the Chicom Type 56, because it was "[f]unctionally . . . indistinguishable" from the AK-47, but had a mounting location so it was safer for testing. *Id.* at 1759; *see also id.* at 794–95. Using the MK17 standards, Davis tested eight of the 349 suppressors and concluded, "If this suppressor had been submitted as a bid sample for a solicitation, the abundance of 'Unacceptable' for the various requirements would have made this suppressor ineligible for [a] contract award." *Id.* at 1783. Specifically, Davis found that the larger diameter of the Landersman suppressors would "cause[] a lot of issues," "obscur[ing] some of your sight picture." *Id.* at 806. He also testified that two of the eight suppressors tested "fell outside th[e] threshold value" of 0.2 inches for accuracy, "mean[ing] they would fail," and one suppressor actually "separated from itself" during testing. *Id.* at 806–07, 813.

The Federal Rules of Evidence provide that a qualified expert witness "may testify in the form of an opinion or otherwise if [his] scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "Implicit in the text of Rule 702, . . . is a district court's gatekeeping responsibility to 'ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (alteration omitted, emphasis in original) (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993)). "Relevant evidence, of course, is evidence that helps 'the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting *Daubert*, 509 U.S. at 591). To be admissible, the testimony "must have 'a valid

31

scientific connection to the pertinent inquiry." *Id.* (quoting *Daubert*, 509 U.S. at 592). "With respect to reliability, the district court must ensure that the proffered expert opinion is based on scientific, technical, or other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Id.* (internal quotation marks omitted) (emphasis in original).

The Davis Report and Davis's testimony were both reliable and relevant to the usability of the suppressors, and Appellants' arguments go to weight, rather than admissibility. Davis successfully demonstrated that the suppressors simply did not work on a functionally indistinguishable weapon, and he applied standards for weapon systems used in comparable government special forces operations. *See Friend v. Time Mfg. Co.*, 422 F. Supp. 2d 1079, 1082 (D. Ariz. 2005) (expert testimony about a malfunctioning lift device met *Daubert* standard where expert had specialized knowledge of "similar devices"); *see also Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 176 (5th Cir. 1990) (professor of mechanical and production engineering allowed to testify about designing point-of-operation safeguards for press brake industry, though he had never designed a press brake or safeguards *for that device*, because he had practical experience with similar devices), *abrogated on other grounds*, *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994); *cf. Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997) (expert testimony about device used on lift truck rejected where there were "significant differences" between that device's effectiveness on two pieces of different construction equipment). While there may have been some differences in the Landersman suppressors

versus the suppressors that would normally be used on an AK-47, Appellants have failed to demonstrate that an "unacceptable" suppressor could still be useful to the Navy at the time Hall ordered, and Mark manufactured, these suppressors.

In sum, Davis's testimony had a "valid scientific connection" to the issue at hand and was based on specialized knowledge. As the district court -- the fact-finder in this case -- stated, "The bottom line is they've got to suppress or they don't do their job." J.A. 837. There was no abuse of discretion here.

## C.

### *Evidentiary and Due Process Arguments*

Appellants raise several other evidentiary and constitutional errors. "[W]e review evidentiary decisions for an abuse of discretion, but legal conclusions concerning the Rules of Evidence or the Constitution de novo." *United States v. Rivera*, 412 F.3d 562, 566 (4th Cir. 2005).

### 1.

Appellants argue they were denied a fair trial based on several theories, including violation of their due process rights. We apply the harmless error standard to evidentiary rulings, even where an appellant claims these rulings violated due process. *See United States v. Poole*, 640 F.3d 114, 118 (4th Cir. 2011) ("When a district court commits an evidentiary error, even one that implicates a defendant's constitutional rights, we ordinarily review that error for harmlessness."). However, we conclude that none of the alleged errors rise to the level of a constitutional violation. As such, we apply the

harmless error standard reserved for evidentiary challenges: "In order for an evidentiary ruling to be harmless, we must find that the judgment was not substantially swayed by the error." *United States v. Johnson*, 617 F.3d 286, 295 (4th Cir. 2010) (citation omitted); *see also id.* ("Often in criminal cases where there is a significant amount of evidence which inculpates a defendant independent of the erroneous testimony, the error is considered harmless.").

We reject all of Appellants' arguments under a harmless error standard, and specifically discuss three here: (1) the district court reversed its pretrial factual finding that the suppressors were reasonably priced; (2) it failed to draw proper inferences in favor of Appellants in lieu of Hall's destroyed notes; and (3) it failed to consider the Gill Stipulation.

a.

First, assuming Appellants had the chance to demonstrate (and did demonstrate) that the suppressors were reasonably priced at $5,000 a piece, or assuming that the district court accepted this as fact even though the suppressors did not meet Navy standards, sufficient evidence of an agreement to commit mail fraud -- and overt acts committed in furtherance thereof -- abound. *See supra*, Section II.A.1. Moreover, the conversion conviction likewise does not rise and fall on the unit price of the suppressors. *See supra*, Section II.A.2. Thus, the judgment was not substantially swayed by the suppressor price.

34

b.

Second, even if the district court failed to draw all permissible inferences in favor of Appellants in lieu of the handwritten notes, the "possible harm flowing from the district court's in limine ruling . . . is wholly speculative," considering Hall chose not to testify about the content of those notes. *Luce v. United States*, 469 U.S. 38, 41 (1984). In any event, the testimony about the content of those notes from the suppression hearing may have shown general knowledge or tacit approval of a suppressor purchase by Lucchino or Martinage. But as the district court acknowledged, "[e]ven if such notes had been preserved they would not have explained why this procurement went to David Landersman's brother." J.A. 1032. Moreover, Hall did not produce any official documentation memorializing this approval. Thus, any error would likewise be harmless.

c.

Third, even if the district court erred in failing to consider the Gill Stipulation, that piece of evidence does not establish that Hall acted in good faith. To the contrary, as explained above, there is a barrage of evidence proving Hall acted with the requisite knowing and willful intent. *See Analytical Eng'g, Inc. v. Baldwin Filters, Inc.*, 425 F.3d 443, 453 (7th Cir. 2005) (explaining that if a reviewing court finds error in the district court's consideration of the parties' stipulation, "that error would be harmless" if "the district court's consideration of the parties' stipulation in no way affected the relief granted"). The court made several other rulings supporting its conclusion that Hall had not demonstrated a legitimate (and urgent) governmental need for 349 suppressors from

35

an untested machinery company in California. *See, e.g.*, J.A. 1031–32 ("[I]f these suppressors were needed so urgently, why did [Hall] let them sit in Zalewski's warehouse from February 19, 2013 until they were seized . . . ?"); *id.* at 1032 ("If there had been an entity in the Navy which really wanted or needed these items, why did that entity not claim them?"). Therefore, any error in failing to consider the Gill Stipulation is harmless, as it surely would not have substantially swayed the judgment.

2.

Finally, we address Mark Landersman's argument that the district court abused its discretion in failing to admit Hall's suppression hearing testimony regarding the destruction of his notes. Rule 804 allows the admissibility of prior testimony of an unavailable witness, including a witness who invokes his Fifth Amendment privilege. The prior testimony meets an exception to the hearsay rule if the testimony was (1) "given as a witness at a . . . hearing . . . , whether given during the current proceeding or a different one," and (2) "is not offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1). However, even if the testimony meets a hearsay exception, the court must still perform a balancing test under Rule 403 in order to determine whether any probative value "is substantially outweighed by a danger of . . . undue delay, wasting time, or needlessly preventing cumulative evidence." Fed. R. Evid. 403; *see Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co.*, 951 F.2d 613, 620 (4th Cir. 1991) ("Certainly, the trial judge has discretion under Rule 403 to exclude a [hearsay

36

statement], even if [it] meets the requirements of an exception." (internal quotation marks omitted)). And here, "[t]he record reflects that, without mentioning Fed[eral] Evidence Rule 403, the district court did undertake the requisite balancing" and excluded Hall's prior testimony on that ground. *United States v. Gallo*, 782 F.2d 1191, 1193–94 (4th Cir. 1986). As a result, we cannot say the court abused its discretion.

Therefore, Appellants' evidentiary and constitutional arguments do not undermine the verdicts rendered in this case.[15]

### III.

For the foregoing reasons, we affirm Appellants' convictions.

*16-4066, AFFIRMED*
*16-4067, AFFIRMED*

---

[15] Appellants also jointly raise a separate argument in the classified briefing. *See* Hall's Opening Br. 1, Landersman's Opening Br. 20. We have independently reviewed this argument and find no reversible error.