**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-4510

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SEITU SULAYMAN KOKAYI,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.   Leonie M. Brinkema, District Judge.  (1:18-cr-00410-LMB-1)

Argued:  July 16, 2021                                          Decided:  August 24, 2021

Before FLOYD, THACKER, and QUATTLEBAUM, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:**  Anthony Hamilton Nourse, LAW OFFICE OF ANTHONY H. NOURSE, PLC, Fairfax, Virginia; Mark John Petrovich, PETROVICH & WALSH, PLC, Fairfax, Virginia, for Appellant.   Joseph Attias, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:**  G. Zachary Terwilliger, United States Attorney, Kellen S. Dwyer, Assistant United States Attorney, Dennis M. Fitzpatrick, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Seitu Sulayman Kokayi ("Appellant") appeals his conviction on two counts of coercion and enticement of a minor in violation of 18 U.S.C. § 2422(b), and one count of transferring obscene material to a minor in violation of 18 U.S.C. § 1470. The Government gathered the evidence supporting these convictions while Appellant was under surveillance pursuant to the Foreign Intelligence Surveillance Act ("FISA").

Appellant lodges four challenges to his convictions. First, he claims the district court erred in denying his requests to disclose and suppress the evidence collected pursuant to FISA. Second, he contends that his convictions pursuant to § 2422(b) violate double jeopardy. He argues that the convictions were for violations of the same statute and based on the same course of conduct and facts. Third, Appellant maintains that one of his convictions pursuant to § 2422(b) violates the Equal Protection Clause because § 2422(b) more heavily penalizes those who use interstate communication facilities to engage in prohibited sexual conduct with minors. And fourth, he challenges the convictions for lack of sufficient evidence.

For the reasons explained below, we find no error and affirm.

I.

A.

Factual Background

Appellant was convicted following a bench trial. The following facts were presented at trial. We view them in the light most favorable to the Government. *See United States v. Garcia-Ochoa*, 607 F.3d 371, 376 (4th Cir. 2010).

At the time of the underlying events giving rise to this case, Appellant, a United States citizen, was 29 years old. From 2009 until his arrest in August 2018, he was a teacher at a mosque in Washington, D.C., where he taught the Koran to students between the ages of five and 18. The 15 year old victim (hereinafter "Victim") was a student of Appellant's at the time of the charged conduct. She had been his student on and off for five to six years, after she and her family immigrated to the United States from Ethiopia. Appellant was also socially familiar with the Victim's family, and he sometimes drove the Victim and her sister to and from Koran class.

The Victim got her own iPhone in early August 2018. Around August 2, 2018, Appellant sent a direct message to the Victim on Instagram asking for her phone number. On August 4, 2018, Appellant and the Victim had their first of many phone conversations. They discussed the Victim's timeline for marriage and work and study abroad opportunities once she began high school. The Victim stated that she could not study abroad "because . . . I'm not in high school yet." J.A. 270.[1] Appellant responded, "[Y]ou literally have to wait until summer is over." *Id.* At the end of the call, Appellant asked whether he was "up in the ranks with [Victim]," adding, "I would say maybe top uh, like 50?" *Id.* at 271. The Victim replied that Appellant was "Like top 5. Top 5." *Id.* at 272.

Between August 4, 2018, and Appellant's arrest 19 days later, Appellant spoke on the phone with the Victim 256 times. Cumulatively, the 256 calls lasted over 32½ hours,

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

which averages to around 12 to 13 calls a day. In addition, during this same period, Appellant had at least 43 FaceTime[2] calls with the Victim.

On August 4, 2018, Appellant drove the Victim and her sister to the airport because the Victim was traveling to Minnesota to visit relatives. During the two and a half weeks the Victim was in Minnesota and Appellant remained in the D.C. area, the following conversations between Appellant and the Victim took place:

- August 9, 2018, at 2:42 a.m. -- Appellant and the Victim spoke about when "things changed" between them. The Victim stated, "we started getting to know you and you started giving us . . . ride[s] home," to which Appellant responded "Yeah, then things changed." Appellant asked, "Wait…does your mom know?" The Victim responded, "Do I actually look like the girl that talks to her mom about these things? … I've been hiding it okay." J.A. 273. Later, Appellant talked about whether he and the Victim would "touch" and whether things will "escalate." He continued … "I'm just throwing it out there, right? And like, that's gonna like, escalate, and, right? … because then [the Victim]'s going to be hooked, so, we can't have that." The Victim responded, "probably you would be hooked." To which Appellant responded, "you wish." After some more banter, Appellant stated, "Look, if we do kiss, you will be hooked, just saying, okay? Leave it at that." *Id.* at 276. Later Appellant asked, "have you thought about, like, what I said … Scenarios or situations where things could happen." After the Victim deflected the question a few times, Appellant stated again, "the question is, I said, 'have you thought about what I said could happen?' … Meaning, like, oh, if we're alone, or something like that." *Id.* at 279. The Victim deflected the question but Appellant persisted, stating multiple times that

---

[2] FaceTime is an Apple Inc. cell phone application that allows users to communicate over video. *See United States v. Perrin*, 926 F.3d 1044, 1048 n.4 (8th Cir. 2019). There are both audio and video components to FaceTime. According to the Government, Apple stores the audio but not video recordings, so the Government only introduced audio recordings and transcripts of phone calls and FaceTime calls in the district court. *See* Appellee's Br. 6–7; J.A. 642.

"It's hard for me to stop thinking about it…. Thinking about you and things that we could do, okay?" Appellant later asked, "What if we kiss?" The Victim answered, "Then we kiss, I guess. I don't know." *Id.* at 281–82.

- August 11, 2018, at 1:28 a.m. -- Appellant asked the Victim several times whether "hypothetically" she would marry him, and she eventually said she would. J.A. 294. After discussing being together, the Victim asked, "If you see me, what is the first thing you would do if you could?" Appellant responded, "give you a hug, and kiss you." In response, the Victim quipped, "That's two things." Appellant then asked, "What about you?" to which she responded, "[a] kiss." *Id.* at 297. Appellant then asked, "You want more? … if you could do two things, then . . . what's your next thing?" The Victim responded, "Like, if we're in a comfy place, I would literally cuddle . . . . And kiss, still kiss." *Id.* at 297–98. Appellant then asked repeatedly, "So um, what's the third thing?" to which the Victim responded, "the only thing left." *Id.* at 300. Appellant then pressed her to say it more explicitly. In response, the Victim stated, "The third thing . . . was going to be sex . . . ." Appellant pressed the Victim, stating, "What? Say it again." When she refused, Appellant stated, "Oh my god just say it . . . [w]hat's the third thing?" Appellant stated that the second thing was "[k]issing, obviously . . . And then find a place we can go and we start your lessons." *Id.* at 301. Appellant then asked repeatedly, "what's your third thing . . . what's your third thing . . . [o]h my god, what is your third thing?" The Victim responded, "It's the last thing left on my, uh, you know?" "Okay, so tell me," Appellant insisted. The Victim responded by spelling, "'S'…'E,' you got it or do you want me to finish?" Appellant laughed and said, "I got it," before asking, "So, how are we going to make this happen?" *Id.* at 302. Appellant then asked the Victim whether she was "wet right now" and demanded that she "be honest," to which she responded, "[y]es." *Id.* at 303. Appellant then asked whether they could FaceTime, and the call ended.

- August 11, 2018, at 2:47 a.m. -- Appellant told the Victim she was very attractive and, "I really want you." Shortly thereafter, Appellant told the Victim, "It would have been the perfect time for you to, uh, be in the area while I'm off," and that "I'm already thinking how I can see you and different things."

6

Appellant asked the Victim if she knew "the list of things that I want to do?" J.A. 312. When the Victim asked what it was, Appellant stated, "I want …to give you an orgasm first … and then I feel like after that, then you can start your lessons." *Id.* at 311. The Victim later stated, "but you been through this before" because "[y]ou did help create somebody, right?" referring to the fact that Appellant is a father. He responded that it is "[e]asy as riding a bike," and the Victim responded: "We'll find out then. Probably I will find out?" *Id.* at 314. Appellant stated, "You have a lot to learn." Appellant then said, "I feel like a want to give you a hug. Just squeeze you," and that he would do so "once you get back" from the Midwest. *Id.* at 315–16. Appellant later stated, "I can't wait until you get back." The telephone call ended after Appellant and the Victim discussed transitioning to FaceTime. *Id.* at 319. Records obtained from Apple show that Appellant initiated a FaceTime call to the Victim at 4:09 a.m.

- <u>August 12, 2018, at 3:37 p.m.</u> -- Appellant and the Victim discussed the FaceTime session that occurred the night before, with Appellant asking whether the victim "actually ha[d] an orgasm too?" to which the Victim responded, "[y]es." J.A. 643. Appellant then said he was "still really upset" because the Victim had "put [him] on mute." *Id.* Appellant said, "What the hell is wrong with you? …. Don't you know that's the point? So, I can hear you? Not so you can be like, 'Oh, ok…I think it's about that time. I'm gonna mute myself.' What?" Appellant then asked, "[B]ut did you enjoy it though?" and the Victim said, "yep." Appellant then stated, "I saw you, uh, staring extra hard at my side. I was like, 'Oh, shoot' . . . I didn't think that it would escalate more than that. I surprised myself." Appellee's Br. 9–10 (quoting Gov't's Tr. Ex. 38).

- <u>August 19, 2018, at 2:50 a.m.</u> -- Appellant repeatedly asked the Victim to participate in a FaceTime call. After the Victim gave multiple excuses not to, he told her multiple times, "[Y]ou should take a picture." J.A. 328. The Victim said that she wanted to but couldn't because she was cold and her tooth hurt, but she did say, "I love you," to which Appellant responded by whispering, "love you." *Id.* at 329–30. Later, Appellant asked what the Victim would say if he asked to marry her in four years. The Victim initially said, "Now, I don't know. [In]

7

[f]our years, I have no clue." *Id.* at 333. Finally, the Victim said "you know what? I would probably say yes." *Id.* at 334.

The Victim's father asked Appellant to pick up the Victim and her sister at the airport when they returned from Minnesota on August 24. On August 22 into the morning of August 23, Appellant and the Victim spoke 20 times by phone and FaceTime. Most of these conversations revolved around discussing Appellant's penis and Appellant asking the Victim to film herself taking a shower:

- August 22, 2018, 2:32–3:31 p.m. -- Records from the Victim's iPhone show a FaceTime call with Appellant. During this conversation, Appellant asked the Victim, "[H]ow should I act when I see you?" "What if I touched you?" "Are you gonna sit in the front seat?" "[H]ow about my lap?" J.A. 344–46. The Victim indicated that she could not sit on his lap given the size of his penis, asking rhetorically, "Have you seen that thing?" *Id.* at 346.

- August 22, 2018, 4:02–4:23 p.m. -- Appellant and the Victim spoke by phone. Appellant asked the Victim if she was having "that time of the month problems." J.A. 349. The Victim told Appellant that it was a false alarm and Appellant responded by stating, "[s]o you're telling me we could've, uh, you know?" *Id.* at 350.

  Appellant and the Victim went on to discuss Appellant taking a shower and he said, "I would say you wanna come with." J.A. 351. The Victim declined, but later brought up the shower again and Appellant said, "Let's stop talking about the shower before [the Victim's sister] comes back and be like, 'Were you all talking about the shower?'" *Id.* at 354. Shortly thereafter, Appellant asked the Victim, "Okay? So [Victim] can you just do it for me[?] … shower [with] me. Call it a day." The Victim said, "I would love to, but no. . . . I don't want to." *Id.* at 355.

  Appellant responded, "If I ever ask you that and you were here, you better say yes…. We have an agreement," and the Victim said, "No." J.A. 355. Appellant asked again and

8

the Victim again said "no" and changed the topic. At the end of this telephone conversation, Appellant said he should probably take a shower. The Victim responded, "I'm gonna come with." Appellant responded, "Oh you wanna come . . . I literally told you you can." Appellant then stated, "I'll FaceTime you." *Id.* at 358. That phone call ended at 4:23 p.m.

- August 22, 2018, 4:23–5:04 p.m. -- Directly thereafter, Appellant and the Victim had a series of FaceTime calls. At the beginning, Appellant stated, "Oh, did you get prepared and ready[?]" The Victim's response was unintelligible, but Appellant then said, "That's why I literally said, you better -- well, if I am like this, there better not be some random person like walks by, like 'uh, okay.'" J.A. 360. Appellant continued, "That would be very awkward." Appellant started to say, "need to find my under--," but instead recounted a story about when he stopped wearing "tighty whities" and started wearing boxers. *Id.*

- August 22, 2018, 5:26–5:29 p.m. -- Presumably after the Victim showered, the Victim said, "I don't know what's wrong with my phone." Appellant responded, "I think I do. I think I know." Appellant asked the Victim if she had rice in the house and the Victim said, "Yeah." Appellant asked, "Uncooked? Okay you're probably gonna have to put your phone in there maybe, so it can like suck out all of the water." Appellant continued, "That's why I feel bad! I told you but I thought that you would know like to try to keep your phone away somehow." Appellee's Br. 13 (quoting Gov't's Tr. Ex. 54).

Appellant was arrested on August 23, 2018, while the Victim was still in Minnesota. Appellant submitted to a voluntary interview with the FBI, during which he admitted the following:

- He and the Victim had talked about being physical when she returned from Minnesota.

9

- He planned to pick up the Victim at the airport on August 24.

- He and the Victim showered simultaneously over FaceTime on August 22 and they "[b]asically" "played with [them]selves in front of each other" in the shower. J.A. 408.

- He saw the Victim naked and they transmitted FaceTime video of each other masturbating.

- He and the Victim both climaxed.

- He denied knowing that the Victim was under 16 years old.

The Victim was interviewed by a Child and Adolescent Forensic Interviewer ("CAFI") while in Minnesota. She told the CAFI that she was visiting a relative and planned to fly home the next day. When the CAFI asked the Victim if she knew why they were interviewing her, she replied with Appellant's first name and identified him as her Koran teacher.

The Victim said she had been communicating with Appellant while she was in Minnesota by phone and FaceTime. She explained that her FaceTime conversations with Appellant included the showing of nude body parts. For example, the Victim stated that Appellant told her how to move her clothing to expose her breasts and to "flash" her breasts at him. J.A. 644. She said Appellant showed his penis multiple times and he was "doing stuff physically with his hands with his penis" during these times. *Id.* However, the Victim claimed that she always moved her phone away so that she did not actually see Appellant's penis.

The Victim also said Appellant told her he wanted to "grab [her] boobs," and that he wanted to "kiss [her] boobs. Eat [her] out. And …. Play with [her]." J.A. 649. She explained that "play with [her]" meant "play with [her] vagina." *Id.* An FBI special agent also testified that Appellant "confirmed that he had talked with the [Victim] on a few occasions about having sex and that they had also discussed getting a hotel room." *Id.* at 556; *see also id.* at 644 (district court noting that Appellant told the Victim "they could get a hotel room to have sex once she returned to the D.C. area").

The Victim stated Appellant climaxed while they were on FaceTime together. She also said Appellant initiated a FaceTime call to her while he was in the shower. Appellant "asked her to finger herself while on previous FaceTime sessions," although she stated that she did not do so, but instead, just told Appellant that she did. J.A. 603–04.

The Victim also told the CAFI that Appellant knew her age because of Koran class registration. The Victim stated that she met Appellant in 2012 upon her arrival in the United States when she first began taking Koran lessons, at which time she would have been approximately nine or ten years old. Other evidence revealed that on the Victim's fifteenth birthday, Appellant sent her three Bitmojis[3] on Instagram wishing her a happy birthday. Appellant also helped the Victim to apply for a visa, and in order to do so, the Victim had to text him a photograph of her permanent resident card. That card showed the Victim's date of birth. Minutes after receiving the Victim's green card, Appellant's Google

---

[3] A Bitmoji is "a brand name for a digital cartoon image that is intended to look like and represent you, used in electronic communication." *Bitmoji*, Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/bitmoji.

11

history shows that he searched "where is the number on a permanent resident card." J.A. 655. Finally, during one of their conversations, Appellant said that four years from then, the Victim "would most likely be in college," and the Victim clarified she would be in her "first year." *Id.*

B.

Procedural History

On November 8, 2018, a grand jury in the Eastern District of Virginia returned an indictment against Appellant, charging him with the following:

- Count One: knowingly using a facility or means of interstate commerce to knowingly persuade, induce, entice and coerce a 15 year old girl to engage in sexual activity that is illegal under federal law,[4] "specifically, to produce child pornography in violation of [18 U.S.C. § 2251]," all in violation of 18 U.S.C. § 2422(b);

- Count Two: knowingly using a facility or means of interstate commerce to knowingly persuade, induce, entice, and coerce a 15 year old girl to engage in sexual activity that is illegal under Virginia law,[5] "specifically, to engage in sexual acts with 29 year old Appellant, in violation of [Va. Code § 18.2–371]," all in violation of 18 U.S.C. § 2422(b); and

- Count Three: knowingly using a facility or means of interstate commerce to knowingly transfer and attempt to transfer obscene matter, "specifically, a live video depiction of his penis and Appellant masturbating," to

[4] The indictment also charged a violation of Virginia and Minnesota child pornography laws, but the conviction was based on the federal child sexual exploitation statute, 18 U.S.C. § 2251(a).

[5] The indictment also charged a violation of Maryland and D.C. laws, but the conviction was based on Virginia law.

someone who has not attainted the age of 16 years, in violation of 18 U.S.C. § 1470.

The day after the indictment was returned, the Government filed a Notice of Intent to use FISA information in the district court. On December 17, 2018, Appellant filed a motion to suppress "all evidence and interceptions made and electronic surveillance and physical searches conducted pursuant to [FISA] and any fruits thereof" and for "disclosure of the underlying applications for FISA warrants." J.A. 134. The motion explained,

> [D]isclosure of the FISA applications to defense counsel is an essential prerequisite to an accurate determination of the legality of the FISA surveillance and due process in this case. Otherwise the defense will be unable to adequately represent the defendant[], and the Court will not have the benefit of the defense perspective on the key issues related to determining whether the FISA surveillance was lawful.

*Id.*

On February 21, 2019, the Government filed an unclassified response to the motion to suppress, along with an affidavit from the Attorney General, explaining that disclosure of the materials to defense counsel or an adversarial hearing would "harm the national security of the United States" and that it was appropriate for the district court to conduct an in camera, ex parte review of the materials. J.A. 201. After reviewing the FISA materials in camera, the district court denied the request to disclose those materials, explaining that disclosure to the defense was neither warranted nor necessary. The district court also denied the motion to suppress, finding that the surveillance was lawfully authorized, conducted in compliance with FISA, and did not violate Appellant's rights.

On April 8 and 9, 2019, the district court held a bench trial. At the close of the Government's case, Appellant made a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29, which was denied. In that motion -- for the first time -- Appellant moved to dismiss Counts One and Two on double jeopardy grounds. Following trial, the district court found Appellant guilty of Counts One and Three and took the resolution of Count Two under advisement. Ultimately, on May 8, 2019, the district court found Appellant guilty of Count Two, rejected the double jeopardy argument, and filed a memorandum explaining its findings and conclusions on all counts (the "Memorandum Opinion"). Appellant then filed a renewed motion for acquittal, again asserting, inter alia, that his convictions on Counts One and Two constituted a violation of double jeopardy.

On June 28, 2019, Appellant was sentenced to 120 months of imprisonment -- 120 months on each of Counts One and Two, and 60 months on Count Three, all to run concurrently. On July 9, 2019, the district court denied the renewed motion for acquittal. Appellant timely noted this appeal the following day.

## II.

## FISA Evidence

We first address Appellant's challenges to the district court's decisions on the FISA evidence. Appellant makes two arguments: (1) the district court failed to disclose the FISA application and supporting documentation to defense counsel, in violation of *Franks v.*

14

*Delaware*, 438 U.S. 154 (1978)[6]; and (2) the district court erred in denying its motion to suppress the FISA evidence.  We reject both of these arguments.

A.

Disclosure

Where, as here, an aggrieved person files a motion to suppress a FISA application and supporting documentation, and where the Attorney General certifies that disclosure of FISA materials or an adversarial hearing would "harm the national security of the United States" -- the district court "shall" "review in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." 50 U.S.C. § 1806(f).  "[T]he court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance."  *Id*.  If the district court "determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that due process requires discovery or disclosure."  *Id.* § 1806(g).

---

[6] *Franks* held, "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."  438 U.S. at 155–56.

15

Putting all of this together, we have explained, "The language of section 1806(f) clearly anticipates that an *ex parte, in camera* determination is to be the rule. Disclosure and an adversary hearing are the exception, occurring *only* when necessary." *United States v. Squillacote*, 221 F.3d 542, 554 (4th Cir. 2000) (quoting *United States v. Belfield*, 692 F.2d 141, 147 (D.C. Cir. 1982)) (emphasis in *Belfield*); *see also United States v. Hassan*, 742 F.3d 104, 138 (4th Cir. 2014) ("We have emphasized that, where the documents 'submitted by the government are sufficient' to 'determine the legality of the surveillance,' the FISA materials should not be disclosed." (quoting *Squillacote*, 221 F.3d at 554) (alteration omitted)). And this court has rejected the argument that "the FISA structure denied [defendants] their constitutionally established right to a *Franks* hearing." *United States v. Dhirane*, 896 F.3d 295, 300 (4th Cir. 2018). Recognizing "the benefit that an open, adversarial proceeding could provide, particularly in cases where a falsehood in the affidavit could be more readily identified by the defendant or his counsel than by a court perhaps less familiar with the subject matter," we nonetheless concluded, "Congress did not run afoul of the Constitution when it reasoned that the additional benefit of an unconditional adversarial process was outweighed by the Nation's interest in protecting itself from foreign threats." *Id.* at 301.

In the case at hand, the district court concluded that disclosure of FISA materials to the defense "[wa]s not necessary to make an accurate determination of the legality of the surveillance." J.A. 261. Against this legal backdrop and having reviewed the FISA materials at issue here in camera, we find no error in this determination.

B.

Suppression

With regard to the suppression motion, Appellant, without having had a chance to review the FISA materials, argues that the Government's FISA application(s) "may fail to establish the requisite probable cause"; "may contain intentional or reckless falsehoods or omissions"; "may not have included required certifications"; and "may not have contained or implemented the requisite minimization procedures." Appellant's Br. 28–33. Addressing these issues required this court to review classified materials in camera. Having reviewed the materials, and having fully considered Appellant's arguments, we affirm the district court's denial of Appellant's suppression motion.

III.

Double Jeopardy

Next, Appellant contends his convictions violate the Double Jeopardy Clause protection against multiple punishments for the same offense because "Counts 1 and 2 of the Indictment both allege violations of 18 U.S.C. § 2422(b) [and] while the Indictment alleges different predicate offenses to form the basis for the violation of count 1 and 2, there is no difference in the factual allegations supporting those alleged violations." Appellant's Br. 35. Appellant further avers that because "the elements of the underlying criminal offenses do not become elements of § 2422(b)," "Counts 1 and 2 allege violations of the exact same statute and statutory elements." *Id.* at 35–36.

We review de novo questions concerning the Double Jeopardy Clause. *See United States v. Schnittker*, 807 F.3d 77, 81 (4th Cir. 2015).

17

A.

The Counts

The Government charged Appellant with two violations of the same statute, 18 U.S.C. § 2422(b), in Counts One and Two. That statute provides:

> Whoever, using the mail or any facility or means of interstate or foreign commerce . . . knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in . . . ***any sexual activity for which any person can be charged with a criminal offense***, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

18 U.S.C. § 2422(b) (emphasis supplied). The difference between Counts One and Two is that each count charges a different "sexual activity for which any person can be charged with a criminal offense." *Id.*

The "criminal offense" listed in Count One (and the one relied upon by the district court) is 18 U.S.C. § 2251(a). This law punishes a defendant who "employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct." 18 U.S.C. § 2251(a). "Sexually explicit conduct" is defined in relevant part as "actual or simulated . . . masturbation." *Id.* § 2256(2)(A)(iii).

In contrast, the "criminal offense" charged in Count Two is Virginia Code section 18.2–371. This law provides, "Any person 18 years of age or older . . . who . . . engages in consensual sexual intercourse or anal intercourse with or performs cunnilingus, fellatio,

18

or anilingus upon or by a child 15 or older not his spouse, child, or grandchild is guilty of a Class 1 misdemeanor." Va. Code § 18.2–371.

Through his filings and representations to this court, Appellant's double jeopardy arguments appear to involve two separate aspects of the proceedings below: (1) the indictment; and (2) the evidence used to convict on each count. We address each in turn.

B.

Challenge to the Indictment

We first address Appellant's purported challenge to the indictment that the same offense was charged in more than one count, also known as multiplicity. *See United States v. Lawing*, 703 F.3d 229, 235 n.7 (4th Cir. 2012) ("Multiplicity is the charging of a single offense in several counts." (internal quotation marks omitted)). The Government argues that Appellant has waived any multiplicity challenge by not raising it before trial. We agree.

Federal Rule of Criminal Procedure 12 clearly provides:

> The following defenses, objections, and requests **must be raised by pretrial motion** if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits: . . . a defect in the indictment or information, including: . . . charging the same offense in more than one count (multiplicity).

Fed. R. Crim. Proc. 12(b)(3)(B)(ii) (emphasis supplied). "If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely." Fed. R. Crim. Proc. 12(c)(3). It is undisputed that the first time Appellant raised his double jeopardy argument was in his motion for acquittal after the close of the Government's case, and he again made

19

the argument in his renewed motion for acquittal after the verdict. Thus, by operation of the rule, Appellant's multiplicity challenge to the indictment must fail.

However, "a court may consider the defense, objection, or request if the party shows good cause." Fed. R. Crim. Proc. 12(c)(3). Here, Appellant contends there is good cause for this court to entertain his challenge to the indictment because he asserts the issue he raises "did not arise until the close of the Government's evidence and argument." Appellant's Br. 40. But this argument falls flat because in both Appellant's motion for acquittal and in this appeal, much of his argument is based on the way Counts One and Two were charged, which was readily available on the face of the indictment and would clearly have put Appellant on notice before trial. *See, e.g.*, J.A. 659 ("Counts I and II allege violations of the exact same statute and statutory elements."); *id.* at 661 ("[I]n the indictment, other than identifying the alleged predicate offenses, there are no different facts alleged in the different counts."); *see also* Appellant's Br. 35–36, 38 (making these same arguments on appeal). Therefore, to the extent Appellant is making a multiplicity argument based on charges in the indictment, his argument is waived pursuant to Federal Rule of Criminal Procedure 12(b)(3).

## C.

### Evidence Supporting the Convictions

#### 1.

Despite specific challenges to the indictment and the allegations therein, Appellant maintains that the type of challenge he is bringing is not *merely* a challenge to the indictment. Rather, he argues, "the Double Jeopardy violation herein . . . is based on a

combination of the statute, the indictment, [and] *the evidence presented*, *argued* and *relied on* to support the allegations." Appellant's Br. 39 (emphases in original). Even assuming this argument does not fall within the ambit of Rule 12(b)(3), it is without merit.

In the district court, Appellant argued "the allegations of Count 1 are more narrow and would have essentially been subsumed by Count 2 [in violation of] double jeopardy." J.A. 571–72. Specifically, in his posttrial motion for acquittal, Appellant asserted:

> [T]he Government relied on *all* of the evidence presented, including all of the FaceTime calls . . . to establish and support both arguments that [Appellant] was "grooming" the minor female victim . . . , and generally that he violated the statute as alleged in Count 2. This was evident in writing . . . and during oral arguments in court. Likewise, the Court relied on *all* the evidence presented to accept the government's position. For example, the [Memorandum] Opinion notes "[t]he hundreds of phone calls and FaceTime sessions between the defendant and the minor and the substance of their conversations, both benign and sexual, constitute a substantial step towards getting the minor to assent to sexual activity." Accordingly, since both the government and the Court relied on **all the evidence** to find [Appellant] guilty of Count 2, both the government and the Court relied on **some of the same evidence** to find [Appellant] guilty of Count 1. While the evidence argued to support Count 1 was less substantial, it nonetheless **was a subset** of "all the evidence," and was thus the same evidence relied upon for Count 2. Accordingly, [Appellant] was found guilty of two counts of the exact same statute based on the same facts in violation of his constitutional rights.

J.A. 661–62 (bold emphases supplied) (citations omitted); *see* Appellant's Br. 38–39 (making same arguments on appeal).

## 2.

"It is well-settled that a defendant may be charged and prosecuted for the same statutory offense multiple times when each prosecution is based on discre[t]e[] acts that

21

each constitute a crime." *United States v. Goodine*, 400 F.3d 202, 208 (4th Cir. 2005); *see id.* at 209 (rejecting double jeopardy challenge where "[t]he evidence supporting the two incidents is . . . different"); *see also United States v. Swaim*, 757 F.2d 1530, 1536–37 (5th Cir. 1985) (upholding conviction for violations of the same statute based on "different evidence" and where each count "recite[d] a separate and distinct prohibited act").

As explained below and as detailed in the district court's Memorandum Opinion, the verdicts on Counts One and Two set forth distinct prohibited acts, required different proof, and were based on different evidence.

a.

Proof and Evidence: Count One

With regard to Count One, the district court relied on evidence that Appellant coerced the Victim to engage in either real or simulated masturbation for the purpose of transmitting the video of the same to Appellant. In its oral decision, the district court explained that Appellant encouraged the Victim to appear naked and masturbate over FaceTime and explained to her how to do so, and also instructed her to do a "flash" of her breasts so that he could take a picture. The district court concluded "those two . . . separate incidents . . . alone are . . . sufficient to establish that Count 1" was proven. J.A. 635. And in its Memorandum Opinion, the district court reasoned:

> There was overwhelming evidence that [Appellant] persuaded [the Victim] to send him images over FaceTime of her naked breasts, of herself masturbating, and of her naked body while she was in the shower. [The Victim] described how [Appellant] told her "step by step" how to take off her shirt to expose her breasts and told her to finger herself, instructing her to "put [her] finger there put use [sic] two fingers to do that,

22

put it there." [Appellant] scolded [the Victim] for putting him "on mute" while she was ostensibly having an orgasm, telling her that he was "still really upset with [her]" for silencing her phone, as apparently watching her orgasm was not sufficient. He repeatedly asked her to shower with him over FaceTime, and he admits to seeing her naked body over FaceTime during the shower session.

J.A. 646–47 (quoting Gov't's Tr. Exs. 67, 38). Additionally, in its opinion denying Appellant's renewed posttrial motion for acquittal, the district court reiterated that as to Count One, Appellant "persuaded or attempted to persuade the victim to send him live videos not only of her exposing her breasts and showering, but also of her engaging in either actual or simulated masturbation." *Id.* at 721. Further, "[i]n addition to the recordings of phone calls and FaceTime sessions introduced into evidence, the victim credibly explained to a[] [CAFI] how [Appellant] instructed her to finger herself and once chastised her for putting him 'on mute' while she was ostensibly having an orgasm. . . . There was more than sufficient evidence to convict him of attempting to produce child pornography." *Id.* (citations omitted).

b.

Proof and Evidence: Count Two

As to Count Two, the district court focused on the FaceTime and phone conversations as establishing a pattern of grooming the Victim to ultimately have sex with him. In the Memorandum Opinion, the district court explained:

In Count 2, the defendant is charged with persuading, inducing, enticing, and coercing the minor to engage in sexual relations, conduct, and acts with the defendant upon her return to the D.C. area. The government argued, and the evidence established, that the sheer volume of phone calls and FaceTime

23

conversations between the defendant and [the Victim] established that he was attempting to seduce her. The two had more than 250 conversations in a one-month period and spoke for over 32 hours. [Appellant] argued that only a small portion of these conversations were sexual; however, even those seemingly innocuous conversations played a role in the sexual grooming of the minor. . . .

"Grooming refers to deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity." This is exactly what happened here.

J.A. 647–48 (quoting *United States v. Engle*, 676 F.3d 405, 412 (4th Cir. 2012)) (citation omitted). The district court provided the example of Appellant telling the Victim about his "troubled relationship with his father," explaining to her that "not too many people know like, unless they're like super close, like friends or like family." *Id.* at 648. The district court found that by these conversations, Appellant was "developing a special relationship with [the Victim] to break down any inhibitions [the Victim] may have towards engaging in sexual activity with him" and was engaging in "classic sexual grooming behavior." *Id.* at 648–49. The district court then marshaled all the ways that Appellant was grooming the Victim and coercing or persuading her to engage in sexual conduct with him. *See id.* at 649 (recounting that Appellant asked the Victim "how are we going to make this happen?"; suggested that he would travel to see the Victim; discussed getting a hotel room so they could have sex; told her he would like to "kiss [her] boobs" and "eat her out" and "play with [her vagina]"; told her "[i]f I ever ask you [to shower together] and you were here, you better say yes"; planned to pick her up from the airport; asked whether they would

24

touch and whether she would sit on his lap when he picked her up; discussed explicit sexual acts he would like to perform). Notably, as to Count Two, the district court did not specifically rely on the conversations demonstrating Appellant's intent to cause the Victim to transmit naked or masturbatory images and videos to him. Although the district court mentioned the phone and FaceTime conversations, it was in the context of the frequency, volume, and the "substance of their conversations" in attempting to build a special relationship. *Id.*

c.

Analysis

Appellant maintains that the evidence used to convict on Count One "was subsumed and used by the government and court to convict Appellant" on Count Two. Appellant's Br. 23; *see also* Appellant's Reply Br. 15 ("Both the government and the court relied on the exact same evidence to convict Appellant in Count 1 of the Indictment as that to convict in Count 2" and "[t]he evidence for Count 2 completely subsumed that for Count 1."). We disagree. The district court clearly relied on different evidence in convicting Appellant on the two counts, specifically on two different types of conduct in which Appellant coerced the Victim to engage: production of child pornography and sexual relations.

On Count One, the district court focused on Appellant *instructing* the Victim to engage in sexually explicit conduct, that is, masturbation, in furtherance of producing an image or video that, crucially, would be transmitted to him. In Count Two, by contrast, the district court relied on Appellant's grooming conduct -- speaking to the Victim about private and personal things, earning her trust, and then finding a way to arrange a place to

25

have sexual relations. Although both of these approaches were conducted on FaceTime and phone calls and both involved coercion, the evidence used to convict under Count One were "discre[t]e[] acts" and "different" evidence, *Goodine*, 400 F.3d at 208, than the evidence used to convict on Count Two.

For these reasons, we affirm the district court's rejection of the double jeopardy argument.

IV.

Equal Protection Challenge

Appellant next contends that 18 U.S.C. § 2422 violates the Equal Protection Clause because of the disparity between its two subsections -- § 2422(a), which provides a *20 year maximum sentence* for those who coerce and entice an individual to travel in interstate or foreign commerce to engage in "any sexual activity for which any person can be charged with a criminal offense," and § 2422(b), which provides a *10 year minimum sentence and a maximum sentence of life* for using the mail or "any facility or means of interstate or foreign commerce" to coerce or entice "any individual who has not attained the age of 18 years" to engage in sexual activity for which "any person can be charged with a criminal offense." Appellant claims that "there is no rational relationship" between this disparate treatment, and Appellant is "similarly situated to an individual who entices a minor without using any facility or means of interstate commerce." Appellant's Br. 58, 57. He also takes issue with the predicate Virginia crime used to satisfy the "criminal offense" aspect of § 2422(b) -- which is a misdemeanor carrying a twelve month maximum sentence -- and

26

Count Two of the indictment, which carries a 10 year minimum sentence. *See id.* at 55. We conclude that each of these arguments fail.

We review an equal protection challenge to a federal statute de novo. *See United States v. Timms*, 664 F.3d 436, 444 (4th Cir. 2012).

First, Appellant overlooks the single most important difference between § 2422(a) and (b): subsection (b) prohibits using the Internet to entice *minors*, whereas subsection (a) applies to all potential victims, not just minors. Rational basis review (which Appellant agrees is applicable here) requires only that "the classification at issue bears some fair relationship to a legitimate public purpose." *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982). We have held the "[G]overnment's interest in safeguarding the physical and psychological wellbeing of children" is of "surpassing importance." *United States v. Malloy*, 568 F.3d 166, 175 (4th Cir. 2009); *see also United States v. Brown*, 681 F. App'x 268, 270 (4th Cir. 2017) (per curiam) ("[P]rotecting children from sexual exploitation clearly constitutes a government objective of surpassing importance" (internal quotation marks omitted)). As the Government notes, "Congress could rationally have reserved the ten-year mandatory minimum for § 2422(b) convictions while leaving sentencing judges to fashion sentences under § 2422(a) based on individual circumstances while allowing a twenty-year maximum for the most aggravated cases." Gov't's Br. 58; *see also United States v. Banker*, 876 F.3d 530, 538 n.6 (4th Cir. 2017) ("[T]he two subsections contain different penalty provisions, which is consistent with Congress intending the victim's age to be an aggravating factor."). The disparity in sentences readily passes rational basis review.

As for the difference in the state and federal crimes involved here, pursuant to the dual sovereignty doctrine, Congress and the states may choose to treat a similar crime differently. *See Gamble v. United States*, 139 S. Ct. 1960, 1964 (2019) (in the double jeopardy context, explaining, "this Court has long held that two offenses are not the 'same offence' . . . if prosecuted by different sovereigns" (emphasis and internal quotation marks omitted)); *United States v. Brucker*, 646 F.3d 1012, 1018 (7th Cir. 2011) (rejecting the equal protection argument that "the state offense on which federal liability is based has no corresponding mandatory minimum" because "Congress and the state legislatures are free to fashion their own, differing approaches to criminal problems and sentencing" (internal quotation marks omitted)). And at least one other court has persuasively explained that the "criminal offense" aspect of § 2422(b) "is generally understood to encompass both misdemeanors and felonies." *United States v. Shill*, 740 F.3d 1347, 1351 (9th Cir. 2014); *see also id.* ("Black's Law Dictionary defines 'criminal offense' . . . as 'a violation of the law; a crime, often a minor one.'" (quoting Black's Law Dictionary (9th ed. 2009)). We agree.

Therefore, Appellant's equal protection challenge fails.

V.

Sufficiency of Evidence

Finally, Appellant challenges the sufficiency of the evidence used to convict him on Counts One and Three, claiming the district court erred in denying his motion for acquittal on these counts.

We review de novo a trial court's denial of a motion for judgment of acquittal. "[I]t is well settled that the verdict . . . must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *United States v. Hassan*, 742 F.3d 104, 139 (4th Cir. 2014) (alterations and internal quotation marks omitted). Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Landersman*, 886 F.3d 393, 406 (4th Cir. 2018) (internal quotation marks omitted).

A.

Sufficiency: Count One

As to the predicate criminal offense on Count One, which was based on 18 U.S.C. § 2251, Appellant contends "there is no controlling authority to support the assertion that the images in this case of the minor's naked breasts and body while taking a shower were pornography, or child pornography." Appellants' Br. 41. Appellant further argues, "[t]he evidence only established that Appellant and the minor FaceTimed each other while taking a shower," *id.* at 42, and otherwise, "[t]here was nothing specific about which area of [the Victim's] clothes [Appellant] could see, or that he requested her to show him anything specifically. There was also nothing in her statements describing that he indicated to her that he saw her feigned masturbation," *id.* at 44. We flatly reject these arguments.

First of all, § 2251 punishes a defendant who entices or coerces a minor "to engage in [actual or simulated masturbation] for the purpose of producing any visual depiction of

29

such conduct or for the purpose of transmitting a live visual depiction of such conduct," 18 U.S.C. §§ 2251(a), 2256.

Appellant admitted in his FBI interview that he "saw [the Victim] completely naked" and she saw him "completely naked," J.A. 413; that they were "transmitting the video of [the two of them] masturbating or in the nude," *id.* at 417; that "over the past two weeks [he] had a handful of FaceTime sessions where [they] saw each other naked or . . . masturbated for each other," one of which was in the shower and other times in the bedroom, *id.* at 421. And the Victim admitted she pretended to masturbate at Appellant's request. *See id.* at 664 ("I always had my finger in my shorts, but it never happened"; "I had long pants and I had my hands in my pants."). At the very least, this satisfies the "simulated . . . masturbation" aspect of the federal statute.

In any event, § 2422(b) does not require the victim to actually *perform* the sexual act; rather, it punishes the defendant for *coercing* the victim to do so. Here, there is ample evidence that Appellant urged, persuaded, enticed, and coerced the Victim to shower over FaceTime, show him her naked body, and masturbate. As the district court explained in its Memorandum Opinion, Appellant "described how [Appellant] told her 'step by step' how to take off her shirt to expose her breasts and told her to finger herself, instructing her to 'put [her] finger there put use [sic] two fingers do that, put it there'"; Appellant "scolded [the Victim] for putting him 'on mute' while she was ostensibly having an orgasm, telling her that he was 'still really upset with [her]' for silencing her phone, as apparently watching her orgasm was not sufficient"; and Appellant "repeatedly asked her to shower with him

30

over FaceTime, and he admits to seeing her naked body over FaceTime during the shower session." J.A. 646–47.

Additionally, Appellant relies on *United States v. Palomino-Coronado*, 805 F.3d 127 (4th Cir. 2015), for the proposition that "the government was required to prove that production of a visual depiction was a purpose of engaging in the sexually explicit conduct," and the Government did not do so here. Appellant's Br. 46 (quoting *Palomino-Coronado*, 805 F.3d at 130) (alteration omitted). Rather, per Appellant, "the production of the 'visual depiction' claimed by the government was not the *purpose* of the communications and use of FaceTime." *Id.* at 46 (emphasis in brief). According to Appellant, FaceTime was merely "the means by which the two could engage in such communications." *Id.* at 46–47.

But *Palomino-Coronado* does not help Appellant. *Palomino-Coronado* explained that pursuant to § 2251(a), the Government must prove the defendant engaged in sexual activity *with the specific intent* to produce a visual depiction. In other words, it is not enough to prove merely that the defendant took a picture or video during the sexual activity. *See* 805 F.3d at 130–31. In *Palomino-Coronado*, the defendant had sexual relations with a minor several times and, on one occasion, took and then deleted a single picture. *See id.* at 132. We explained that the single deleted photo, standing alone, was "not evidence that [the defendant] engaged in sexual activity with [the minor] *to* take a picture, only that he engaged in sexual activity with [the minor] *and* took a picture." *Id.* (emphases in original). But in the case at hand, the evidence demonstrates that Appellant enticed the Victim to

31

produce live visual depictions of her naked body and masturbation (simulated or real) *for the purpose* of transmitting those live video depictions to Appellant.

B.

Sufficiency: Count Three

As to Count Three, Appellant contends there is insufficient evidence that Appellant had actual knowledge that the Victim was less than 16 years old. He claims the proof was based "almost entirely upon circumstantial evidence." Appellant's Br. 48.

The evidence on this element was strong, and the district court did not err in finding that Appellant had actual knowledge of the Victim's age. On this point, the district court found:

> [T]he evidence established beyond a reasonable doubt that he knew she was less than 16 years old. When asked if [Appellant] knew how old she was, [the Victim] stated unequivocally, "He knows I'm 15." She said he knew her age because he knows her birthday from having registration papers for Quran class[,] which list her date of birth and because she had told him on her most recent birthday in June 2018 that she was turning 15 and would be missing Quran class to celebrate. On her birthday, [Appellant] sent [the Victim] three happy birthday Bitmojis on Instagram. In addition, [the Victim] had sent [Appellant] a copy of her permanent resident card so that he could help her with a visa application. Seconds after receiving the permanent resident card, [Appellant] searched "where is the number on a permanent resident card" on Google. This Google search proves that [Appellant] was examining the permanent resident card closely. That permanent resident card included [the Victim]'s date of birth. Other evidence clearly put [Appellant] on notice of [the Victim's] young age. For example, he knew that she was about to start high school, and when [the Victim] said that she could not study abroad because she was not yet in high school, he responded "you literally have to wait until summers over." Later in that same conversation, [Appellant] asked [the Victim] where she sees herself in five years and she

32

replied, "out of high school and fresh into college." During another conversation, [Appellant] said that four years from now, [the Victim] would "most likely be in college," and [the Victim] clarified that she would be in her "first year." Most students are less than 16 years old when they begin high school. Accordingly, the government adduced more than enough direct and indirect evidence at trial to prove that [Appellant] knew that [the Victim] was less than 16 years.

J.A. 655. This evidence is quite compelling. As a result, there is no error in the district court's denial of Appellant's motion for acquittal.

## VI.

For the foregoing reasons, none of Appellant's arguments have merit, and we affirm the district court in all respects.

*AFFIRMED*